662 A.2d 523

MYSTIC ISLE DEVELOPMENT CORPORATION, A NEW JERSEY CORPORATION, STANLEY N. DRINKWATER, JR., STANLEY N. DRINKWATER, III, ESQUIRE, AND PATRICK DRINKWATER, INDIVIDUALS, PLAINTIFFS-RESPONDENTS, AND CROSS–APPELLANTS, v. PERSKIE & NEHMAD, A PROFESSIONAL CORPORATION, STEVEN R. NEHMAD, ESQUIRE, AND BENJAMIN ZELTNER, ESQUIRE, DEFENDANTS-APPELLANTS AND CROSS–RESPONDENTS, AND JOHN DOES 1–50, INCLUSIVE, FICTITIOUS NAMED DEFENDANTS, JOINTLY, SEVERALLY, AND IN THE ALTERNATIVE, DEFENDANTS.

Argued March 28, 1995—Decided August 1, 1995.

314

*John L. Slimm* argued the cause for appellants and cross-respondents Perskie & Nehmad, etc., and Benjamin Zeltner, Esquire (*Slimm & Goldberg,* attorneys; *Mr. Slimm, Lila Wynne Williams,* and *Peter S. Cuddihy,* on the briefs).

*Carl D. Poplar* argued the cause for appellant and cross-respondent Stephen R. Nehmad, Esquire (*Poplar & Eastlack,* attorneys).

*Clifford L. Van Syoc* argued the cause for respondents and cross-appellants (*Mr. Van Syoc*, attorney; *Mr. Van Syoc, Evan A. Blaker*, and *Margaret M. Allen*, on the briefs).

The opinion of the Court was delivered by

HANDLER, J.

This case, as does the case of *Circle Chevrolet v. Giordano, Halleran & Ciesla*, 142 *N.J.* 280, 662 *A.*2d 509, also decided today, raises the issue of whether the entire controversy doctrine, as it applies to the joinder of parties, is applicable to attorney-malpractice actions.

In this case, defendants, who are practicing attorneys, claim that the entire controversy doctrine bars the tort claims brought against them subsequent to the termination of a prior litigation derived from the same factual circumstances giving rise to those claims. Plaintiff argues that attorney-malpractice actions involve special considerations and thus should be exempted from the scope of the doctrine. Plaintiff also maintains that because the first litigation was dismissed without prejudice as to one defendant, the entire controversy bar should not be applied to prevent its claim against its attorneys.

I

Plaintiff Mystic Isle Development Corporation (Mystic), a real estate developer, purchased property from J.K. Development Company (J.K.). The property, located in Weymouth Township, Atlantic County and known as "Lenape Landing," was to be developed as a residential apartment complex. Mystic purchased the rights to construct 78 townhouses or Phases II and III of the complex.

Mystic and its principals, Stanley Drinkwater, Jr., Stanley Drinkwater, III, and Patrick Drinkwater, acquired title to the property on May 10, 1985. According to Mystic, its agreement of sale obligated J.K. to obtain 78 sewer permits from the Weymouth

Township Municipal Utilities Authority (MUA) so that Mystic could proceed with developing Phases II and III of the complex. Mystic states that an April 15, 1985 letter signed by James Kenneally, a principal of the J.K. Corporation, assigned 78 sewer permits to Mystic. J.K. claims that it did not write this letter.

Defendant law firm, Perskie & Nehmad (P & N), represented J.K. in its efforts to obtain the appropriate zoning approval and sewer permits. Because the MUA would allocate only 38 Domestic Consumer Units (DCUs) of sewerage capacity to J.K. for Lenape Landing, which was only enough to accommodate Phase I of the development, J.K. filed suit against the MUA to compel the MUA to allocate sewer permits for the remainder of the development. P & N later timely amended the complaint to name Mystic as an additional plaintiff because Mystic had recently acquired title to a portion of the property. At his deposition, Stephen Nehmad testified that Mystic was added to the complaint "simply for technical reasons ... because they were the parties that had standing to whatever phase of the real estate was allocable to that amount of allocation which we were seeking to obtain." In or about May 1985, J.K. sold Phase I of the development to Lenape Landing Association, a limited partnership. On July 16, 1985, P & N's motion for partial summary judgment was granted. The trial court voided the MUA's reservation of sewerage capacity and ordered the MUA to reconsider J.K.'s application. As a result, the MUA adopted a resolution that allocated 18 additional DCUs to the development, bringing the total of approved DCUs to 56.

P & N again commenced litigation against the MUA, seeking to compel the issuance of sufficient permits for the entire development. Ultimately, they obtained an order, dated January 14, 1986, which required the MUA to issue permits for Phases I and II. The order did not allocate any permits for Phase III. The order also directed the MUA to establish that it had no additional sewerage capacity to allocate to the development. The MUA subsequently established that there was insufficient capacity for the full development, and the suit was dismissed without preju-

dice. At this point sewer permits were allocated to all of Phase I and a portion of Phase II, while Phase III did not receive any permits. Mystic contends that the MUA, through J.K., had promised it that sewer permits would be issued first to Phase III, then Phase II and then Phase I.

Consequently, on April 30, 1986, Mystic, represented by Michael McKenna, filed suit in Atlantic County against the MUA, individual members of the MUA, the State of New Jersey Department of Community Affairs, Lenape Landing Association, the D'Anastasio Corporation, John D'Anastasio, J.K., and Carole Houser and James Kenneally, the principals of J.K (hereinafter the "Atlantic County action"). Mystic did not bring suit against P & N. Mystic alleged that: (1) the MUA had wrongfully refused to issue sewer permits and had ignored an assignment of permits to Phases II and III of the development and instead issued permits to the Lenape Landing Association, owner of Phase I of the Development; (2) J.K. and Carole Houser had fraudulently misrepresented the status of the sewer permits and J.K.'s ability to obtain those permits; (3) Houser, Kenneally, and J.K. breached the terms of the assignment, which required allocation of the first 78 permits to Mystic, by tendering 36 permits to the Lenape Landing Association; (4) Houser, Kenneally, and J.K. had sought to sell the same sewerage permits twice, with full knowledge of the MUA; and (5) D'Anastasio and his companies misrepresented that they owned the capacity while knowing of plaintiff's assignment. In bringing suit, Mystic relied on an April 1, 1985 MUA resolution that awarded J.K. 89 DCUs. That resolution was later determined to be a forgery. It was investigated by the Atlantic County Prosecutor's Office, but no indictments were issued. In short, the Atlantic County action sought to determine who was at fault for the insufficient number of sewer permits.

During the course of discovery, Mystic deposed Stephen Nehmad, the attorney who had represented J.K. and Mystic in the sewerage litigation against the MUA. Nehmad testified that he was retained by J.K. to handle the municipal, land use and

environmental permits and approvals for the project that J.K. was developing in Weymouth Township. He testified that at the time he amended the complaint to include Mystic he was unaware of the potential conflict concerning J.K.'s allocation of the sewer permits. He also testified that he told Mystic several times that there was insufficient sewerage capacity to support the full three phases of the development.

A letter dated June 30, 1986, written by Leland Stanford, Nehmad's attorney, and sent to McKenna indicated that, pursuant to an earlier conversation with McKenna, Stanford understood that Mystic did not intend to sue Nehmad. "It is my further understanding that Mr. Nehmad is not a 'target' in the pending litigation, nor is he anticipated to be a defendant."

The court dismissed with prejudice the complaint against D'Anastasio Corporation, John D'Anastasio and Lenape Landing Association by an order entered August 18, 1989. On September 1, 1989, the court signed an order dismissing Mystic's complaint against Carole Houser, without prejudice, because Mystic had failed to provide specific answers to interrogatories. Mystic was given 30 days to comply with certain discovery requests. Mystic failed to act. On December 4, 1989, Houser filed a motion for an order entering final judgment of dismissal with prejudice. The order was granted on December 22, 1989.

Mystic then filed a motion to vacate the dismissal with prejudice. In support of that motion, Mystic provided an affidavit by Stanley Drinkwater, Jr. who stated that Mystic had not received notice of Houser's motion to dismiss with prejudice because the notice was sent to McKenna, who was no longer representing Mystic and failed to forward the notification. Defendants, however, contend Drinkwater did have notice of the motion because McKenna forwarded the motion to Mystic's present counsel, Clifford Van Syoc, on December 11, 1989. Defendants assert that Mystic then made the tactical decision to allow the case to be dismissed.

On July 20, 1990, based on Mystic's representations, the trial court vacated its December 22 order and reinstated the dismissal without prejudice as to Carole Houser. Although there is no evidence in the record of dismissal with prejudice against the MUA, Mystic admits that only the claim against Carole Houser was dismissed without prejudice.

Defendants contend that Mystic obtained the dismissal without prejudice against Houser by providing the trial court with an inaccurate factual and procedural history. By so doing, Mystic maneuvered the procedural posture of its original action to obtain an adjudication that was not on the merits and thereby avoided the consequences of the entire controversy doctrine. Defendants note that Mystic's July 31, 1989 deposition of Stephen Nehmad establishes that Mystic was aware of and considering the possibility of a malpractice claim against P & N. McKenna sent Drinkwater a copy of Nehmad's deposition transcript. Drinkwater also admitted at deposition that McKenna had opined that Nehmad could be liable for legal malpractice and thus he agreed with McKenna's judgment that "we let [the Atlantic County lawsuit] be dismissed. . . ." In short, defendants allege that Mystic elected not to join them in the original action for purely strategic reasons.

Seven months later, on February 1, 1991, Mystic filed this legal-malpractice suit against P & N and two attorneys associated with the firm, Stephen Nehmad and Benjamin Zeltner, in Camden County. Mystic alleges that defendants, without Mystic's authority, amended J.K.'s suit against the MUA to include Mystic as a party and that defendants' failure to obtain Mystic's informed consent to P & N's representation of both J.K. and Mystic constitutes legal malpractice. In short, Mystic contends that a conflict of interest existed for defendants because they were aware that the MUA had issued insufficient sewer permits for the development of the entire project and that J.K. was obligated to provide permits not only to plaintiff, but also to Lenape Landing Association, who had purchased Phase I from J.K. Mystic also claims that defendants (1) knowingly misrepresented to Mystic the

sewer permit situation by claiming that 78 permits had been approved; (2) breached its fiduciary duty to plaintiff; (3) breached an implied contract obligating them to utilize their best efforts on behalf of Mystic; and (4) conspired with J.K., Kenneally and Houser to commit fraud.

In its claim for damages, Mystic seeks lost profits, claiming that once its lender discovered that there was inadequate sewerage for the development, it withdrew financing support. As a result, Mystic not only lost its interest in Lenape Landing but also lost anticipated profits in an unrelated real estate project, the Innskeep development. Mystic claims it had to withdraw from the Innskeep development because of its losses from the Lenape Landing project.

On June 14, 1991, the court denied defendants' motion for summary judgment. Defendants argued that they did not represent both parties, but only added Mystic for purposes of standing. Moreover, they asserted that *Cogdell v. Hospital Center*, 116 *N.J.* 7, 560 *A.*2d 1169 (1989), and the entire controversy doctrine mandated dismissal of the case because a "single cause of action against multiple parties must be litigated in a single law suit." The trial court rejected defendants' claim, concluding that Mystic's malpractice cause of action "did not ripen and become a cognizable cause of action" until it had been resolved in Atlantic County. Because the Atlantic County matter was never ultimately disposed of, due to the dismissal without prejudice with respect to Houser, the trial court ruled that the entire controversy doctrine did not apply.

On January 24, 1994, defendants' cross-motion for reconsideration of summary judgment was denied. The court, citing *Woodward–Clyde Consultants v. Chemical & Pollution Sciences, Inc.*, 105 *N.J.* 464, 523 *A.*2d 131 (1987), held that the entire controversy doctrine did not compel dismissal of Mystic's claim because a dismissal without prejudice is not an adjudication on the merits and therefore does not bar reinstitution of the same claim in a

later action. Also at that time, the court denied plaintiff's motion for partial summary judgment.

On May 23, 1994, the Appellate Division denied defendants' motion for leave to appeal the trial court order. This Court granted defendants' motion for interlocutory review of the Appellate Division's denial of the motion.

## II

■ The fundamental principle behind the inclusion policy of the entire controversy doctrine is that

the adjudication of a legal controversy should occur in one litigation in only one court; accordingly, all parties involved in the litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy.

[*Cogdell, supra,* 116 *N.J.* at 15, 560 *A.*2d 1169.]

The doctrine is a reflection of the constitutional unification of the state courts and the comprehensive jurisdiction vested in the Superior Court established under our Constitution, which recognized the value in resolving related claims in one adjudication so that "all matters in controversy between parties may be completely determined." *N.J. Const.,* art. VI, § 3, ¶ 4.

■ The objectives behind the doctrine are threefold: (1) to encourage the comprehensive and conclusive determination of a legal controversy; (2) to achieve party fairness, including both parties before the court as well as prospective parties; and (3) to promote judicial economy and efficiency by avoiding fragmented, multiple and duplicative litigation. *DiTrolio v. Antiles,* 142 *N.J.* 253, 267, 662 *A.*2d 494 (1995); *Cogdell, supra,* 116 *N.J.* at 22–24, 560 *A.*2d 1169.

■ The doctrine has evolved over time through the common law. The entire controversy doctrine requires a court to adjudicate both equitable and legal issues arising from one underlying transaction. *See O'Neill v. Vreeland,* 6 *N.J.* 158, 168–69, 77 *A.*2d 899 (1951); *State v. Jones,* 4 *N.J.* 374, 383, 72 *A.*2d 872 (1950). In *Massari v. Einsiedler,* 6 *N.J.* 303, 312–13, 78 *A.*2d 572 (1951), the

doctrine was broadened to include the joinder of defenses. The doctrine was further extended to include all affirmative claims that a party might have against another party, including counterclaims and cross-claims, *Ajamian v. Schlanger*, 14 *N.J.* 483, 487–89, 103 *A.2d* 9 (1954), *cert. denied*, 348 *U.S.* 835, 75 *S.Ct.* 58, 99 *L.Ed.* 659 (1954), as well as all parties with a material interest in the controversy, *i.e.*, those who can affect or be affected by the judicial outcome of the controversy. *Cogdell, supra*, 116 *N.J.* at 23, 26, 560 *A.2d* 1169; *R.* 4:30A. It applies to constituent claims that arise during the pendency of the first action that were known to the litigant. *See Circle Chevrolet*, 142 *N.J.* at 290–291, 662 *A.2d* 509 (citing *Brown v. Brown*, 208 *N.J.Super.* 372, 382, 506 *A.2d* 29 (App.Div.1986); *Busch v. Biggs*, 264 *N.J.Super.* 385, 398–99, 624 *A.2d* 1017 (App.Div.1993); *Bendar v. Rosen*, 247 *N.J.Super.* 219, 237, 588 *A.2d* 1264 (App.Div.1991)). In essence, it is the factual circumstances giving rise to the controversy itself, rather than a commonality of claims, issues or parties, that triggers the requirement of joinder to create a cohesive and complete litigation. *DiTrolio, supra*, 142 *N.J.* at 272, 662 *A.2d* 494. However, because the entire controversy doctrine is an equitable principle, its applicability is left to judicial discretion based on the particular circumstances inherent in a given case. *Id.* at 275, 662 *A.2d* 494; *Cogdell, supra*, 116 *N.J.* at 27, 560 *A.2d* 1169.

The boundaries of the doctrine are not limitless. The doctrine does not apply to bar component claims that are unknown, unarisen, or unaccrued at the time of the original action. *DiTrolio, supra*, 142 *N.J.* at 273–274, 662 *A.2d* 494; *R.* 4:30A cmt. 2; *Cafferata v. Peyser*, 251 *N.J.Super.* 256, 260, 597 *A.2d* 1101 (App.Div.1991) ("it is well settled that [the entire controversy doctrine] does not bar transactionally related claims of which a party was unaware during the pendency of the prior litigation"). In addition, we have held that the rule should not be applied when "joinder would result in significant unfairness [to the litigants] or jeopardy to a clear presentation of the issues and just result."

*Cogdell, supra,* 116 *N.J.* at 27, 560 *A.*2d 1169 (quoting *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 354–55, 476 *A.*2d 250 (1984) (Handler, J., concurring)). However, joinder is not a matter of party autonomy. It is for trial court to determine whether or not joinder is appropriate in a given case, and thus litigants should be compelled to bring all actions at one time. *DiTrolio, supra,* 142 *N.J.* at 275, 662 *A.*2d 494 (citing *Brown, supra,* 208 *N.J.Super.* at 381, 506 *A.*2d 29). A trial court is empowered to segregate different claims to assure manageability, clarity and fairness. *Id.* at 275, 662 *A.*2d 494. A plaintiff who fails to allow the trial court the opportunity to supervise the entire controversy risks losing the right to bring that claim later. *Id.* at 275, 662 *A.*2d 494.

## III

Plaintiff urges the Court to make an exception for claims involving an attorney's malpractice. Plaintiff argues that requiring a client to bring an attorney-malpractice claim at the same time he or she brings claims against other parties for actions related to the same underlying transaction is against public policy. It contends that such a requirement presents a conflict for a referred attorney being forced to inform the client about a potential claim against that client's prior attorney who had referred the case. Plaintiff maintains that including legal malpractice claims in the same controversy with other claims will chill attorney-client relations because clients will hesitate to reveal confidentialities that could later be revealed during litigation if that client seeks to sue the attorney for malpractice. Plaintiff also argues that requiring malpractice claims to be joined with the underlying litigation will create frivolous litigation in an effort to ensure that no potential claims are lost. It also claims that the requirement may encourage defendants to counter-claim against a plaintiff's attorney in the hopes of revealing confidentialities. Mystic further maintains that application of the entire controversy doctrine to

legal malpractice actions does not serve the purpose of furthering judicial economy and efficiency because in most cases, the resolution of the main action, whether by judgment or settlement, moots any potential claims against non-parties. Although we recognize that the circumstances surrounding the attorney-client relationship require a trial court's special and thorough consideration in its determination of whether certain claims should be litigated together, we do not believe that those considerations merit excluding attorney-malpractice claims from the mandates of the entire controversy doctrine. *Circle Chevrolet, supra,* 142 *N.J.* at 291–292, 662 *A.*2d 509. Trial courts have the appropriate tools at their disposal to address and accommodate these concerns and to remedy any inequities. *Id.* at 292–294, 662 *A.*2d 509.

Moreover, Mystic's claims against attorney-defendants do not engender the special concerns that may inhere in a derivative attorney-malpractice action. First, while the exact scope of P & N's representation of Mystic remains in issue, it is uncontroverted that P & N did not represent Mystic at any point during the Atlantic County action. Mystic was represented initially by Michael McKenna and later by Clifford Van Syoc. Thus, Mystic's claims against defendants, although sounding in the negligence associated with attorney malpractice, are actually claims against an alleged primary tortfeasor. The risks and considerations inherent in a client's decision to sue his or her current attorney are not present here. Mystic had no fear that revealing attorney-client confidences would prejudice its case against the other defendants because it claimed that the attorney-defendants conspired with J.K. and its principals to defraud Mystic of its contractual rights to the sewerage permits.

Mystic argues, further, that the entire controversy doctrine does not bar its claims against defendants because the damages stemming from defendants' legal negligence could not have been accurately ascertained or quantified until the termination of the Atlantic County litigation. We disagree.

In *Grunwald v. Bronkesh*, 131 *N.J.* 483, 494, 621 *A.*2d 459 (1993), this Court held that the accrual of a legal malpractice claim is governed by the discovery rule. Thus, a claim accrues when "the client suffers actual damage and discovers, or through the use of reasonable diligence, should discover, the facts essential to the malpractice claim." *Ibid.* We hold that for the purposes of the entire controversy bar a professional malpractice claim accrues when: (1) the claimant suffers an injury or damage; and (2) the claimant knows or should know that its injury is attributable to the professional negligence. *Circle Chevrolet, supra,* 142 *N.J.* at 295, 662 *A.*2d 509 (citing *Grunwald, supra,* 131 *N.J.* at 497, 621 *A.*2d 459).

Application of the discovery rule to the facts of this case mandates the preclusion of plaintiff's malpractice claim against defendants. The record indicates Mystic knew of the existence of a malpractice claim while its original Atlantic County action was pending. Depositions taken during the discovery phase of the Atlantic County action reveal that one of Mystic's principals, Stanley Drinkwater, was aware in 1989 of a possible malpractice claim against defendants. A copy of the July 31, 1989 deposition of Stephen Nehmad was immediately forwarded to Drinkwater who then considered whether defendants should be sued. Drinkwater stated that his attorney, McKenna, opined at the time that Nehmad "did not represent our interest in the way he handle[d] his file." Moreover, in his deposition, McKenna testified that his 1989 deposition of Nehmad "put a totally different spin on things" because of "Nehmad's involvement." Consequently, at that point, he advised Mystic to seek a malpractice attorney "if they wanted to pursue that." McKenna also testified that Mystic then asked Clifford Van Syoc to look at the file to determine if there had been malpractice by Nehmad. A December 11, 1989 letter from McKenna to Van Syoc confirms that Van Syoc received affidavits and other materials in relation to Mystic's file at that time. Van Syoc subsequently agreed to take Mystic's legal malpractice case. In sum, the record establishes that Mystic was not only aware of

its injury during its original action but was also aware that defendants were potentially liable for its injury.

## IV

Applying the entire controversy doctrine to bar Mystic's malpractice suit furthers the goals of the doctrine. First, requiring Mystic to join the attorney-defendants would have resulted in a more comprehensive determination of the underlying legal controversy that sought to determine who was responsible for the insufficient number of sewer permits. Mystic alleged in its original action that it was entitled to sewer permits either: (1) through an agreement with J.K. and its principals, Houser and Kenneally; or (2) through the Weymouth MUA, which held back sewers for other members of the community; or (3) through John D'Anastasio and Lenape Landing Association who obtained permits that they knew had been allegedly assigned to Mystic. Mystic's malpractice action contends that defendants, acting as legal representatives for J.K., Houser, and Kenneally, had misrepresented the status of J.K.'s agreement with Mystic and the MUA. Moreover, the second action also alleged that defendants conspired with J.K., Houser and Kenneally to defraud Mystic. Thus, the malpractice claim involves the exact same set of facts as the original action. Joinder of defendants would have clarified the respective roles and responsibilities of J.K., Houser, Kenneally and the attorney-defendants with respect to the agreement and who specifically made what misrepresentations.

Second, party fairness concerns justify the joinder of defendants. As we have repeatedly stated, "considerations of fairness and justness extend to those potentially affected persons who should, because of their stake in a given proceeding, or by virtue of their potential liability, be joined in a single action and given the opportune forum to defend their interests." *Crispin, supra,* 96 *N.J.* at 353, 476 *A.2d* 250 (Handler, J., concurring); *see DiTrolio, supra,* 142 *N.J.* at 273, 662 *A.2d* 494. Defendants are now disadvantaged by Mystic's failure to join them in the Atlantic

County action. They have lost the opportunity to participate in discovery and to develop defenses in the broader litigation context involving all of the responsible participants in the tortious actions giving rise to Mystic's claims. In addition, they have suffered real prejudice. Defendants contend that, despite diligent efforts, James Kenneally cannot be located. They maintain that Kenneally's testimony is essential because he was a principal of J.K. Development Corporation, which entered into the agreement of sale with Mystic. Mystic claims that its agreement of sale provided for sewer approvals for Phases II and III. Defendants maintain that had they been parties to the original suit, they could have questioned Kenneally with regard to the misrepresentations made to Mystic. In sum, joinder would have resulted in a more comprehensive and accurate record and better enabled the relevant parties to apportion liability among themselves.

■ Considering the principle of fairness from the standpoint of plaintiff mandates joinder of defendants in the original action as well. *Cogdell, supra,* instructs that mandatory joinder is not unfair to a plaintiff where "[t]he plaintiff had sufficient information to have included these defendants in the earlier lawsuit." 116 *N.J.* at 25, 560 *A.*2d 1169; *see DiTrolio, supra,* 142 *N.J.* 274, 662 *A.*2d 494. Plaintiff became aware of the potential claim against defendants during discovery. It could readily have amended its complaint and added the attorneys as defendants in that action. Plaintiff had a full and reasonable opportunity in the first action to litigate against all of the implicated parties the issue of responsibility for the lack of permits; it simply chose not to. Plaintiff purposefully let the action be dismissed by refusing to answer interrogatories. Plaintiff attempted to circumvent the applicability of the joinder rule by ensuring that the dismissal would be without prejudice as to at least one defendant in the belief that the dismissal without prejudice would preserve plaintiff's ability to later reinstate the same claim with respect to a different defendant. The outstanding dismissal without prejudice, however, does

not disturb our finding that plaintiff was already given one opportunity to fully and completely litigate the claim arising from the Lenape Landing debacle, it cannot now claim that it was treated unfairly.

The fact that plaintiff instituted the Atlantic County action prior to this Court's decision in *Cogdell* does not affect the applicability of the bar for failure to join related parties. We issued the *Cogdell* decision with the direction that it be applied "only prospectively and to all cases not already on appeal." 116 *N.J.* at 28, 560 *A.2d* 1169; *cf. id.* at 28–29, 560 *A.2d* 1169 (Clifford, J., dissenting in part) (urging that the interests of fairness require retrospective application of the decision). "[A]ll cases not already on appeal" means pending cases involving "the first lawsuit arising out of a common occurrence or transaction." *Circle Chevrolet Co.*, *supra*, 142 *N.J.* at 301, 662 *A.2d* 509 (quoting *Reno Auto Sales, Inc. v. Prospect Park Sav. & Loan Ass'n*, 243 *N.J.Super.* 624, 627 n. 2, 630, 581 *A.2d* 109 (App.Div.1990)).

Although the Atlantic County action was initially filed before *Cogdell* was decided, the suit was not terminated until July 20, 1990, one year after we rendered the decision. Moreover, motions, interrogatories and answers were filed and depositions were taken after the *Cogdell* decision. Plaintiff had ample opportunity to amend its complaint and add attorney-defendants in the underlying transaction in order to avoid risking imposition of the bar. In fact, the record indicates plaintiff knew of the joinder implications when it sought to have the dismissal in favor of Houser changed in the belief that a dismissal without prejudice would preserve its claim against even those defendants not joined in the original action.

Third, joinder promotes judicial economy and efficiency. "At its most fundamental level inefficiency is 'a duplication of lawsuits ... [and] multiple actions each involving the identical controversy and the same witnesses.'" *DiTrolio, supra*, 142 *N.J.* at 278, 662 *A.2d* 494 (citing *Cogdell, supra*, 116 *N.J.* at 26, 560 *A.2d* 1169). Here, plaintiff's second complaint alleges that defen-

dants participated in a conspiracy to defraud Mystic of its contractual rights to sewer permits. It also alleges that defendants, as representatives of J.K. and its principals, misrepresented the status of the permits. The claims involve the same factual proofs as Mystic's prior claims against J.K., Houser and Kenneally. Although plaintiff's additional professional-malpractice claims may involve expert legal-malpractice testimony not directly relevant to the Atlantic County transaction, the fact that evidence relevant to all defendants is not identical and that *some* additional evidence is required as to certain defendants does not warrant a wholly separate suit if the claim arises from the same set of factual circumstances and substantially relies on the evidence adduced in the first litigation. *DiTrolio, supra,* 142 *N.J.* at 278, 662 *A.*2d 494.

In addition, "the consideration of inefficiency and waste of judicial resources is not negated by the fact that a prior action did not proceed to trial or a judgment on the merits." *Ibid.* Although the significance of that factor is diminished to some extent when a case is dismissed before proceeding to trial, where the pre-trial litigation consumed valuable judicial and legal resources, waste and inefficiency remain important. *See id.* at 278–279, 662 *A.*2d 494. Here, the Atlantic County litigation, which began on August 30, 1986 and ended with Houser's dismissal on June 20, 1990, extended nearly four years. During that time extensive discovery was taken, including depositions, interrogatories, and several motions that required judicial involvement. Thus, notwithstanding the lack of a resolution of the substantive claim, undertaking an unnecessary second litigation that requires a repetition of essentially all of the discovery fueled by the first action would constitute a waste of resources and an inefficient administration of justice. As we have consistently noted:

> Procedural maneuvering by attorneys that spread-eagle litigation and squanders judicial resources ostensibly to achieve the best result for a client will only rarely and fortuitously produce the just and fair result that is the goal of the justice system. Such conduct should not be unmonitored ... Parties are too often

motivated by strategic and tactical concerns that do not serve the larger interests of justice. The rule must be judicially applied.

[*Crispin, supra,* 96 *N.J.* at 356, 476 *A.*2d 250 (Handler, J., concurring).]

At his deposition, Mystic's attorney admitted that Mystic decided to dismiss the Atlantic County action because the "most culpable parties," Houser and Kenneally were insolvent in bankruptcy. McKenna also felt that the litigation "wasn't going to go away," that its adversary, the MUA, "was funding the fight out of the public trough which knows no limits," that he told his clients, "You're looking at years," and that "the real smoking gun is in the hands of the non-collectible defendants." In short, Mystic made the tactical decision to dismiss the Atlantic County action because of its economic costs, even though it was aware of a malpractice claim against defendants at the time the Atlantic County action was pending.

## V

Plaintiff contends that because the original action was not adjudicated on the merits, the entire controversy doctrine does not prevent reinstitution of its earlier claims and therefore should not bar its malpractice claim against these defendants. Plaintiff cites to *Woodward–Clyde, supra,* 105 *N.J.* at 464, 523 *A.*2d 131, for the proposition that the entire controversy doctrine does not bar a plaintiff from reinstituting a claim previously dismissed without prejudice. *See also Mason v. Nabisco Brands, Inc.,* 233 *N.J.Super.* 263, 267, 558 *A.*2d 851 (App.Div.1989) ("[t]ypically, 'without prejudice' means that there has been no adjudication on the merits of the claim and that a subsequent complaint alleging the same cause of action will not be barred simply by reason of its prior dismissal"); *Malhame v. Borough of Demarest,* 174 *N.J.Super.* 28, 30, 415 *A.*2d 358 (App.Div.1980) (holding Borough could not appeal dismissal of complaint without prejudice because " 'dismissal without prejudice is comparable to a nonsuit under the former practice of law' ").

We conclude, however, that plaintiff's reliance upon the *Woodward–Clyde* line of cases is misplaced. In *Woodward–Clyde,*

we held that a defendant, whose counterclaim was previously dismissed without prejudice for failure to comply with an order of discovery, could reinstate that claim in a later action without violating the entire controversy doctrine. 105 *N.J.* at 475, 523 *A.*2d 131. The reasoning behind the holding was that the defendant had previously complied with the joinder requirement by asserting the counterclaim in the original action. *Id.* at 474, 523 *A.*2d 131. Because the trial court, in its discretion, dismissed the claim without prejudice, the defendant was allowed to reassert that claim later. *Id.* at 472, 523 *A.*2d 131. The entire controversy doctrine does not require that all claims be adjudicated in one proceeding, it merely requires that a party assert those claims at the outset. The trial court has the discretion to structure the litigation to assure efficient administration, clarity and fairness. Thus, it is the party's original compliance with the doctrine, rather than the absence of a conclusive determination of a claim, that ensures preservation of that claim.

Here, Mystic purposely ignored its obligation to assert its claim against defendants in the Atlantic County action. The mere fact that Mystic obtained a dismissal against Carole Houser without prejudice is irrelevant. That is, the dismissal in favor of Carole Houser, a named defendant, was not a dismissal as to P & N, Nehmad, or Zeltner—all non-parties in the Atlantic County action. If these defendants had been joined in the underlying litigation, and if they had obtained an order of dismissal without prejudice, then the claims against them possibly could have been reinstated under our reasoning in *Woodward–Clyde.* *See DiTrolio, supra,* 142 *N.J.* at 279, 662 *A.*2d 494 (noting that settlement agreement containing specific provision granting plaintiff right to bring future claims is not binding on second group of defendants who were not parties or privy to settlement). Pursuant to the entire controversy doctrine, the dismissal without prejudice as to Houser is relevant to plaintiff's ability to reinstate an action against Houser or perhaps even an unknown defendant who was undiscoverable during the pendency of the Atlantic County action. The dismissal without prejudice is immaterial to the assertion of plaintiff's

present claim because clearly Mystic was aware of its claim against defendants at that time.

 Moreover, even if the dismissal without prejudice pertained to an asserted claim against defendants, it would not be dispositive in the circumstances of this litigation. *See DiTrolio, supra,* 142 *N.J.* at 279, 662 *A.*2d 494 (ruling that settlement or dismissal without prejudice is but one factor court should consider when applying entire controversy bar). In certain circumstances, especially where a plaintiff manipulates the judicial system in order to fragment litigation, the principles underlying the entire controversy doctrine may mandate that a suit be barred even though it stems from the dismissal of a prior action without prejudice.

> The rule that a defendant's judgment acts as a bar to a second action on the same claim is based largely on the ground that fairness to the defendant, and sound judicial administration, require that at some point litigation over the particular controversy come to an end. *These considerations may impose such a requirement even though the substantive issues have not been tried, especially if the plaintiff has failed to avail himself of opportunities to pursue his remedies in the first proceeding, or has deliberately flouted orders of the court.*
>
> [*Restatement (Second) of Judgments,* § 19, comment a (1982) (emphasis added).]

The record indicates that Mystic deliberately contrived to have one claim dismissed in the Atlantic County action in order to circumvent the preclusive effect of the entire controversy doctrine on its subsequent malpractice claim. The dismissal of plaintiff's claim against Carole Houser was changed to a dismissal without prejudice only after Mystic represented to the Law Division that it did not have notice of Houser's motion to dismiss the claim with prejudice. Depositions taken during Mystic's subsequent malpractice action have revealed that Mystic did have notice of the motion. Deposition statements by Drinkwater and McKenna, Mystic's former counsel, indicate that Mystic deliberately ignored the notice because it had decided at that time to let the Atlantic County action be dismissed so that it could cut its litigational economic losses in that action and pursue a malpractice cause of action against attorney-defendants.

The record also indicates that Mystic had no intention of continuing the Atlantic County action against J.K. and its principals. If they had wanted to continue that action, they would have responded to the various interrogatories, moved to vacate the prior orders, and then litigated the action against Carole Houser. Yet, McKenna indicated in his deposition that "the most culpable [parties] being the Housers and Kenneally" were "defunct, insolvent in bankruptcy." Thus, "the revelations of Nehmad's involvement," obtained through his July 31, 1989 deposition, "put a totally different spin on things."

## VI

For the reasons expressed, the order of the trial court of June 14, 1991 denying defendants' motion for summary judgment and of January 24, 1994 denying defendant's motion for reconsideration and denying plaintiff's motion for partial summary judgment are reversed and in accordance with *Rule* 4:30A, it is ordered that summary judgment be entered in favor of defendants dismissing the action against them.

So ordered.

O'HERN, J., concurring.

I agree, in the circumstances of this case, that plaintiffs' causes of action against the attorney-defendants and the other defendants whom plaintiffs charged with collective fraud arose simultaneously. That fraud allegedly stemmed from a concerted plan to deprive plaintiffs of sewer permits for their land-development project. In that context, I agree that the entire controversy doctrine required joinder of the attorney-defendants in the plaintiffs' action against the other conspirators. The attorney-defendants, Perskie & Nehmad (a professional corporation), Steven R. Nehmad, and Benjamin Zeltner nominally represented plaintiffs in the permitting process. That representation did not alter the attorneys' status as potential defendants whose interests could be adverse to plaintiffs' interests.

I write separately to urge the Court to reconsider its holding in *Grunwald v. Bronkesh*, 131 *N.J.* 483, 621 *A.*2d 459 (1993). In that case, we held that a cause of action for attorney malpractice arises when a client reasonably believes that an attorney's erroneous opinion has resulted in the client suffering injury, such as an adverse ruling. *Id.* at 499–500, 621 *A.*2d 459. In *Grunwald*, an attorney had given a client an opinion that the client had a binding contract with a purchaser of real property. *Id.* at 488, 621 *A.*2d 459. In an initial hearing the trial court disagreed with counsel on the law of the case, which alerted the client, who was present in court, that his attorney may have been mistaken. *Id.* at 500, 621 *A.*2d 459.

Under the theory that the Court adopts today, a client's attorney-malpractice claim may arise before a trial judge's ruling has been appealed, and that claim must be joined with the pending action—an action that may be en route to an appeal. Does it not make more sense for the attorney and client to maintain a relationship until it is determined whether the attorney's opinion will stand up on appeal? After all, predicting the path of the law can be as difficult as predicting the path of a storm. The forecaster may have all the data and theories at hand, but the outcome may not be as predicted.

I adhere to the view I expressed in *Grunwald:*

> I find myself in agreement * * * with the opinion of Justice Mosk of the California Supreme Court interpreting the concept of injury under the California Legal Malpractice Act. He would construe the concept of injury in [attorney] malpractice cases with the purpose of "furthering the policies underlying statutes of limitations: *i.e.,* judicial economy, avoiding stale claims, and fairness to the parties."
>
> [*Id.* at 503, 621 *A.*2d 459 (quoting *Laird v. Blacker*, 2 *Cal.*4th 606, 7 *Cal.Rptr.*2d 550, 562, 828 *P.*2d 691, 703 (Mosk, J., dissenting), *cert. denied*, —— *U.S.* ——, 113 *S.Ct.* 658, 121 *L.Ed.*2d 584 (1992)).]

As Justice Mosk points out:

> To force malpractice plaintiffs to file their actions before they know the outcome of the case upon which their claim is based does not promote judicial economy. The status of the malpractice claim is uncertain until the appeal in the underlying case is resolved, because if it is ultimately decided in the client's favor the malpractice suit may well become moot for lack of damages.
>
> [*Laird, supra*, 7 *Cal.Rptr.*2d at 563, 828 *P.*2d at 704.]

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, GARIBALDI, STEIN and COLEMAN—7.

Justice O'HERN concurs in result—1.