### Kim D. FIORIGLIO, Plaintiff,

v.

### CITY OF ATLANTIC CITY, James Whelan, Paul Gallagher, Benjamin Brenner, Terrence Mooney, Dennis Brooks, Atlantic City Firefighters' Local 198, and Joseph Rush, Defendants.

### Civil Action No. 96–2295(JEI).

United States District Court, D. New Jersey.

May 6, 1997.

---

Perskie & Wallach by M. Daniel Perskie, Kevin R. Moses, Northfield, NJ, for Plaintiff.

Freeman, Zeller & Bryant by Ronald Freeman, Cherry Hill, NJ, for Defendant City of Atlantic City.

Murray, Murray & Corrigan by David F. Corrigan, Tamara M. Burke, Little Silver, NJ, for Defendant James Whelan.

Goldenberg, Mackler & Sayegh by Harry Goldenberg, Atlantic City, NJ, for Defendant Dennis Brooks.

Levine, Staller, Sklar, Chan, Brodsky & Donnelly by John M. Donnelly, Atlantic City, NJ, for Defendant Benjamin Brenner.

Tuohy & Tuohy by Dennis Tuohy, Atlantic City, NJ, for Defendant Terrence Mooney.

## OPINION

IRENAS, District Judge:

This matter involves claims brought by firefighter Kim Fioriglio ("Fioriglio") against the City of Atlantic City ("City"), the City's Mayor, James Whelan, and several City officials following the City's decision not to promote Fioriglio to the position of battalion chief. Fioriglio maintains that the decision to not promote him was the result of a conspiracy among the defendants to punish him for running against James Whelan in the 1994 mayoral election. Fioriglio previously filed a federal suit against the New Jersey Department of Personnel ("NJDOP") and several state officials in which he alleged civil rights violations arising from the state's promotion testing procedures and the City's failure to promote him (the "racial discrimination suit"). This Court dismissed the racial discrimination suit on October 15, 1996. Fioriglio never attempted to join the current claims and defendants in the racial discrimination suit.

Defendants now move to dismiss plaintiff's complaint as barred by New Jersey's entire controversy doctrine. Defendants also move to dismiss portions of plaintiff's complaint for failure to state claims upon which relief can be granted. Because New Jersey's entire controversy doctrine does not attach to this Court's prior federal judgment or Fioriglio's state administrative proceedings, the Court will deny defendants' motions to dismiss under the entire controversy doctrine. Because Fioriglio's defamation count was brought outside the statute of limitations and because his N.J.L.A.D. count fails to state a claim upon which relief can be granted, the Court will grant defendants' motions in part.

## I. BACKGROUND

Kim Fioriglio's claims in the present action, as well as his claims in the racial discrimination suit, arise from his inability to achieve a promotion to the rank of battalion chief in the Atlantic City Fire Department. In order to be eligible for that promotion, Fioriglio took the battalion fire chief examination administered by the NJDOP. The examination consisted of a written section and an oral section. Fioriglio completed the written portion of the examination on September 22, 1990 and completed the oral portion on November 21, 1991. On February 6, 1992, the exam results were posted and Fioriglio was ranked number one on the eligibility list from which promotions to battalion chief are made.

On February 18, 1992, Fioriglio received notice that the NJDOP and U.S. Department of Justice had decided to re-score the examination pursuant to a 1977 consent decree which was issued in response to allegations of racial discrimination in the hiring and promotion of minority firefighters. The consent decree required the NJDOP to conduct job analysis of the firefighter promotional titles and to establish examination and promotion procedures in a manner consistent with the consent decree. Prior to the re-scoring, the written component of the examination had been worth 40% of the total evaluation. After the re-scoring, the written component was scored on a pass-fail basis. As a result, Fioriglio dropped from number one on the eligibility list to number twelve. Fioriglio subsequently filed administrative appeals to increase his score. After these appeals, Fioriglio moved from number twelve on the eligibility list up to a four-way tie for sixth.

In the time period following Fioriglio's placement on the promotion list, those individuals ranked higher than Fioriglio and one of the individuals tied with him were promoted to battalion chief. By April 26, 1993, Fioriglio was in a three-way tie at the top of the promotion list. In February 1994, Fioriglio announced that he was running for Mayor of Atlantic City, a position held by James Whelan. In an election held on May 12, 1994, Whelan defeated Fioriglio and other opponents by a significant margin.

In New Jersey, an appointing authority is given broad discretion to choose among the top three individuals on an eligibility list when making a promotion. *See* N.J.S.A. § 11A:4–8 (authorizing certification of three eligibles); N.J.A.C. § 4A:4–4.2(c)(2) (same); N.J.A.C. § 4A:4–4.8(a)(3) (allowing appointment of one of the top three eligibles). Pursuant to this so-called "Rule of Three," Mayor James Whelan, on December 1, 1994, promoted to battalion chief the two individuals on the promotion list with whom Fioriglio was then tied. As a result, Fioriglio was never promoted.

On January 17, 1995, Fioriglio filed a complaint with the NJDOP and the Public Employment Relations Commission ("PERC") alleging that the City's refusal to promote him was the result of "discriminatory and retaliatory motives." By decision dated June 26, 1995, the PERC refused to issue a complaint because they did not have the statutory authority to address Fioriglio's grievances. On February 13, 1996, the NJDOP found that the initial determination of the appointing authority was correct and decided not to take action on Fioriglio's administrative complaint. On April 14, 1996, Fioriglio filed an appeal of the NJDOP's decision with the Division of Merit System Practices and Labor Relations. That appeal is still pending.

On July 19, 1995, Fioriglio instituted his racial discrimination suit in the U.S. District Court against the NJDOP and several individual state government officials. In his complaint, Fioriglio alleged various civil rights violations arising from the state's adjustment of the examination scores in conjunction with the consent order and his subsequent inability to earn the promotion to battalion chief. Fioriglio alleged that the state's actions to comply with the consent decree had discriminated against him based on his race. He filed an amended complaint in that matter on September 15, 1995. As amended, Fioriglio's racial discrimination complaint alleged violations of the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, the New Jersey Constitution, the New Jersey Law Against Discrimination ("N.J.L.A.D."), N.J.S.A. §§ 10:5–1 to 5–42, and common law tort principles.

Fioriglio initiated the present action on May 9, 1996 (the "retaliation suit"). In this complaint, Fioriglio alleged that several City officials including Mayor James Whelan, City Solicitor Paul Gallagher, Fire Chief Benjamin Brenner, and Fire Department supervisors Terrence Mooney and Dennis Brooks conspired against him in violation of his free speech rights under the federal and state constitutions. In particular, Fioriglio alleged that the defendants denied him a promotion to battalion chief in retaliation for his mayoral campaign against James Whelan. Fioriglio also asserted claims for defamation and tortious interference with business activities as well as claims pursuant to the N.J.L.A.D. and the New Jersey Conscientious Employee Protection Act ("C.E.P.A."), N.J.S.A. §§ 34:19–1 to 19–8.

In connection with discovery in the racial discrimination suit, the defendants in that suit deposed Fioriglio on July 16, 1996. Fioriglio indicated at his deposition that the reason he was not promoted was because he ran for mayor against James Whelan. Furthermore, at oral argument during the racial discrimination suit, Fioriglio stated in open court, "I ran for mayor against the Mayor and they didn't promote me because I ran for mayor." *Fioriglio v. New Jersey Dep't of Personnel*, No. 95–3422, 1996 WL 599400 n. 6 (D.N.J. Oct.15, 1996) (Irenas, J.). Fioriglio also stated that so long as James Whelan is Atlantic City's mayor, "there won't be no promotion." *Id.* On October 15, 1996, the District Court dismissed Fioriglio's complaint in the racial discrimination suit on the merits. The defendants in the present action have

now moved to dismiss Fioriglio's complaint. Although Fioriglio failed to join the present claims and defendants in his racial discrimination suit, the Court finds his present action not barred by New Jersey's entire controversy doctrine.

## II. DISCUSSION

### A. Entire Controversy Doctrine–Racial Discrimination Suit

■ New Jersey's entire controversy doctrine "encompasses a mandatory rule for the joinder of virtually all causes, claims, and defenses relating to a controversy between the parties engaged in litigation." *Cogdell v. Hospital Ctr. at Orange*, 116 N.J. 7, 16, 560 A.2d 1169 (1989). The entire controversy doctrine requires that whenever possible, "the adjudication of a legal controversy should occur in one litigation in only one court." *Id.* at 15, 560 A.2d 1169. The doctrine dictates that a party must assert all affirmative claims he or she has against another party including counterclaims and cross-claims. *See Circle Chevrolet v. Giordano, Halleran & Ciesla*, 142 N.J. 280, 289, 662 A.2d 509 (1995); *Ajamian v. Schlanger*, 14 N.J. 483, 487–89, 103 A.2d 9, *cert. denied*, 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 659 (1954). In addition, a party must join "all parties with a material interest in the controversy, i.e., those who can affect or be affected by the judicial outcome of the controversy." *Circle Chevrolet*, 142 N.J. at 289, 662 A.2d 509; *Cogdell*, 116 N.J. at 23, 26, 560 A.2d 1169. However,

> the entire controversy doctrine does not require that all claims and parties proceed to culmination in one litigation. Rather, all claims and parties must initially be joined together before one court. The Court can determine for itself how best to proceed with the various claims and parties. In order to exercise this discretion, however, the court must be fully informed of the extent of the controversy before it.

*Petrocelli v. Daniel Woodhead Co.*, 993 F.2d 27, 31 (3d Cir.1993). New Jersey Court Rule 4:30A sets forth the penalty for failing to comply with the requirements of the entire controversy doctrine. The Rule states: "Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine." R. 4:30A.[1]

■ The goals of the entire controversy doctrine are threefold: "(1) to encourage the comprehensive and conclusive determination of a legal controversy; (2) to achieve party fairness, including both parties before the court as well as prospective parties; and (3) to promote judicial economy and fairness by avoiding fragmented multiple and duplicative litigation." *Mystic Isle Dev. Corp. v. Perskie & Nehmad*, 142 N.J. 310, 322, 662 A.2d 523, 529 (1995) (citations omitted). However, it should be noted that the entire controversy doctrine is limited in certain respects. The doctrine only bars claims of which the plaintiff was or should have been aware at the time of the prior litigation, *see Circle Chevrolet*, 142 N.J. at 294, 662 A.2d 509, and which arise from "related facts or the same transaction or series of transactions." *DiTrolio v. Antiles*, 142 N.J. 253, 267, 662 A.2d 494 (1995). Moreover, because the entire contro-

---

1. In a recent opinion, the Third Circuit characterized the entire controversy doctrine as closely related to traditional res judicata principles and held that like res judicata, the entire controversy doctrine requires some measure of judicial finality before it can be applied. *See Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883 (3d Cir.1997). However, the entire controversy doctrine developed from and is more closely related to mandatory joinder rules. *See Cogdell*, 116 N.J. at 20, 560 A.2d 1169 ("We perceive ... that the commonality of purposes in both the party-joinder and claims-joinder rules indicates that they are conceptual subsets of the entire controversy doctrine."). Indeed, from 1979 until 1990, when Rule 4:30A was adopted, the entire contro-

versy doctrine appeared in N.J. Ct. R. 4:27–1(b) ("Joinder of Claims"). Rule 4:30A refers to the "Non-joinder of claims and parties." While the wellspring of res judicata or collateral estoppel is the notion of finality of a court's adjudication, the entire controversy doctrine is designed to prevent the fragmentation of litigation and applies even when the first case adjudicates an issue different from the second. *See Mortgagelinq v. Commonwealth Land Title Ins. Co.*, 142 N.J. 336, 348, 662 A.2d 536, 542 (1995) ("[A] dismissal for failure to comply with the entire controversy doctrine is more similar to a threshold adjudication than to an adjudication on the merits of the claim.").

versy doctrine is equitable in nature, it is not applied where "joinder would result in significant unfairness to the litigants or jeopardy to a clear presentation of the issues and a just result," *Mystic Isle*, 142 N.J. at 323, 662 A.2d at 529, or where "the first proceeding occurred before a lesser tribunal." *Petrocelli*, 993 F.2d at 29.[2]

■ Defendants assert that Fioriglio's current action is barred by New Jersey's entire controversy doctrine. They allege that Fioriglio was aware of the present cause of action prior to his institution of the racial discrimination suit. Therefore, defendants assert, Fioriglio was required to join the present claims and defendants to that previous action because both actions arose from Fioriglio's attempt to be promoted to battalion chief. Fioriglio maintains that he was not required to join the discrimination and the retaliation suits because the two actions arose from different circumstances at different times and present different claims against different defendants. Indeed, Fioriglio's first action challenged the procedure by which the NJDOP rescored the fire chief examination and sought to place him at the top of the eligibility list. In contrast, the second action challenged City officials failure to promote Fioriglio once he had risen to the top of the eligibility list-in effect, after time had corrected the wrong on which he based his first action.

The differences between Fioriglio's two federal actions make a colorable argument for allowing his retaliation suit to proceed despite the entire controversy doctrine. The nature of the wrongs alleged, the defendants alleged to have committed them, and the timing of the alleged wrongs all differ as between the two actions. Yet, had Fioriglio joined his claims together while both actions were pending, it would furthered the goals of the entire controversy doctrine-encouraging the final resolution of his disputes, promoting judicial efficiency, and achieving a greater party fairness. Although the result is far from clear, the Court will assume for the

purposes of this motion that a New Jersey state court would preclude Fioriglio's instant action under the entire controversy doctrine. Nevertheless, this assumption does not resolve the issue of whether this Court should apply the entire controversy doctrine to bar Fioriglio's retaliation suit.

Whether considered a procedural rule of joinder, or a substantive rule of preclusion (or both), the entire controversy doctrine is a New Jersey rule, not a federal one. As noted in *Mortgagelinq* and in *State v. Minter*, 116 N.J. 269, 561 A.2d 570 (1989), "the federal courts are considered those of another sovereign." *Minter*, 116 N.J. at 279, 561 A.2d at 575. Application of entire controversy doctrine presupposes two litigations in which the failure to join claims or parties in the first forum bars the subsequent pursuit of those claims or parties in the second and later forum. Where the first forum is a New Jersey state court, applying the entire controversy doctrine where the second forum is a federal court or the court of another state presents no conceptual problem, a least after the first forum has rendered its judgment. The Full Faith and Credit Act, 28 U.S.C. § 1738, requires a federal court to give a New Jersey judgment the same preclusive effect New Jersey would give it. *See Rycoline*, 109 F.3d at 886–87; *Peduto v. City of North Wildwood*, 878 F.2d 725, 728 (3d Cir. 1989).

Where the first forum's judgment is rendered by a non-New Jersey court which does not have an entire controversy doctrine, the doctrine's application is murkier, since the second forum would be asked to bar claims based on a judgment which would not bar those very same claims were they thereafter asserted in the first forum itself. In *Mortgagelinq*, the New Jersey Supreme Court nevertheless held,

> [W]hen a party deliberately chooses to fragment litigation by suing certain parties in another jurisdiction and withholds claims against other parties, a New Jersey

2. In Rycoline, the Third Circuit held that the entire controversy doctrine does not preclude the initiation of a second litigation before a related first action has been concluded. However, the *Rycoline* Court did not reach the question posed by the present case, namely, whether the doctrine can be utilized to dismiss a second action where two actions had been pending simultaneously and the first action was later dismissed. *See Rycoline*, 109 F.3d at 889 n. 2.

Court need not later entertain the claims against the omitted parties if jurisdiction was available in the first forum.

*Mortgageling,* 142 N.J. at 338, 662 A.2d at 537. Since this result cannot be explained by notions of full faith and credit or comity, its theoretical underpinnings are uncertain, as Justice Pollack noted in dissent. *See id.* at 348–55, 662 A.2d at 542–46.[3] However questionable is the conceptual basis for applying the entire controversy doctrine to a case when only the second forum is a New Jersey state court and the first forum has more traditional notions of joinder, its application in cases where neither the first forum nor the second forum are New Jersey state courts stretches the doctrine to its breaking point.

In this case both the first and the second fora are the United States District Court for the District of New Jersey. In the first suit Fioriglio joined certain pendant state law claims to his essential federal cause of action. This Court dismissed these state claims early in the litigation as outside the applicable statutes of limitations. *See Fioriglio v. New Jersey Dep't of Personnel,* No. 95–3422 (D.N.J. May 21, 1996) (order dismissing state-law claims). Plaintiff no doubt could have joined his claims in this case to the first action. However, since Federal Rules of Civil Procedure 18, 19, and 20 do not (either individually or collectively) impose entire-controversy-doctrine-type joinder rules on federal court litigants, he was not required to do so.

The only real argument for applying the entire controversy doctrine to the present matter is that the original suit included state law claims which this Court decided on the merits. *See Angel v. Bullington,* 330 U.S. 183, 190–91, 67 S.Ct. 657, 661–62, 91 L.Ed. 832 (1947) (deeming a dismissal on statute of limitations grounds a decision on the merits). At least one interpretation of *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), suggests that federal judgments on state-law issues should have the same impact they would have if rendered by New Jersey courts. The argument is straightforward. If the entire controversy doctrine is part of "the substantive law of New Jersey," *Rycoline,* 109 F.3d at 886–87, or at the very least outcome-determinative, then *Erie,* as interpreted in *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), gives a federal judgment on a New Jersey claim decided under a court's diversity or supplemental jurisdiction the same effect as if it were rendered by a New Jersey state court. Accordingly, the judgment dismissing plaintiff's state-law claims in the first action is the legal equivalent of a New Jersey ruling doing the same thing, such that any state or federal court in the nation should accord it the same preclusive effect that New Jersey would.

However, this argument oversimplifies the *Erie* choice of law inquiry. An *Erie* analysis involves a three-question inquiry. First, is there a valid federal statute or rule of procedure on point, such as a Federal Rule of Civil Procedure or a Federal Rule of Appellate Procedure? *See Hanna v. Plumer,* 380 U.S. 460, 473–74, 85 S.Ct. 1136, 1145–46, 14 L.Ed.2d 8 (1965). If so, then the federal law is to be applied even if there is conflicting state law. If not, the second question is whether the application of the state law in question is likely to determine the outcome of the lawsuit. *See id.* at 470–71, 85 S.Ct. at 1143–44. If the state law is not outcome-determinative, federal law is used. But if the state law is deemed to be outcome-determinative, the third question is asked: is there an overriding federal interest justifying the application of federal law? *See Byrd v. Blue Ridge Rural Elec. Coop., Inc.,* 356 U.S. 525, 537–38, 78 S.Ct. 893, 900–01, 2 L.Ed.2d 953 (1958). If state law is outcome-determinative and there is no countervailing federal interest, state law controls. Otherwise, federal law controls. In applying this test, courts are to be guided by the goals of the *Erie*

---

**3.** Excellent, if slightly esoteric, discussions of the problems in applying the entire controversy doctrine when the first forum and the second forum are not New Jersey Courts may be found in Stephen B. Burbank, *Where's the Beef? The Interjurisdictional Effects of New Jersey's Entire Controversy Doctrine,* 28 Rutgers L.J. 87 (1996), and Rochelle Cooper Dreyfuss & Linda J. Silberman, Interjurisdictional Implications of the Entire Controversy Doctrine, 28 Rutgers L.J. 123 (1996).

doctrine: to prevent forum shopping and to avoid the inequities that occur when results depend on the citizenship of the parties. *See Hanna*, 380 U.S. at 467–68, 85 S.Ct. at 1141–42. *See generally* Erwin Chemerinsky, *Federal Jurisdiction* § 5.3 (2d ed.1994).

Arguably, Federal Rules of Civil Procedure 18 through 20, governing joinder of parties and claims, constitute valid federal laws "on point." As one commentator has argued,

> [Federal Rules 19 and 20] lay down both the maximum scope of joinder (the ceiling), and the minimum scope [of joinder] (the floor). Particularly when juxtaposed with Rule 20, Rule 19 can plausibly be regarded as a statement of federal policy concerning the extent to which it is appropriate for a federal trial court to override party autonomy. If so, that policy would be frustrated by application of state preclusion law that more tightly constrained party autonomy (by requiring more expansive party joinder), since the content of the governing preclusion law would effect trial strategy in the initial action.

Burbank, *supra* note 3, at 109–10. Accordingly, following the first step of the *Erie* analysis, the "on point" federal joinder rules should apply to federal diversity judgments notwithstanding the conflicting state joinder rule of the entire controversy doctrine. *See Hanna*, 380 U.S. at 473–74, 85 S.Ct. at 1145–46.

Assuming the federal joinder rules not "on point," the Court should still apply federal as opposed to state joinder rules. To be sure, under the second step of the *Erie* analysis, the decision to apply federal or state joinder rules is outcome-determinative in its most basic sense: if New Jersey law is applied, Fioriglio's instant action is barred under the entire controversy doctrine, whereas application of federal law would allow the case to proceed. However, an overriding federal interest justifies the application of federal law:

One of the strongest policies a court can have is that of determining the scope of its own judgments. It would be destructive of the basic principles of the Federal Rules of Civil Procedure to say that the effect of a judgment of a federal court was governed by the law of the state where the court sits simply because the source of federal jurisdiction is diversity. The rights and obligations of the parties are fixed by state law. These may be created, modified, and enforced by the state acting through its own judicial establishment. But we think it would be strange doctrine to allow a state to nullify the judgments of federal courts constitutionally established and given power also to enforce state created rights. The *Erie* doctrine is not applicable here. . . .

*Kern v. Hettinger*, 303 F.2d 333, 340 (2d Cir.1962) (citations omitted); *see also Cemer v. Marathon Oil Co.*, 583 F.2d 830, 831–32 (6th Cir.1978); *Aerojet–General Corp. v. Askew*, 511 F.2d 710, 715–18 (5th Cir.), *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975); *Glick v. Ballentine Produce, Inc.*, 397 F.2d 590 (8th Cir.1968); Restatement (Second) of Judgments § 87 cmt. a.

Although the Third Circuit recently skirted this very issue, it noted, without approval or disapproval, that the majority of the courts of appeals have concluded that federal law should govern in circumstances similar to those here. *See Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 962 & n. 2 (3d Cir.1991). The Restatement and Wright and Miller concur with this majority view. *See* Restatement (Second) of Judgments § 87 ("Federal law determines the effects under the rules of res judicata of a judgment of federal court.");[4] 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4472 (1981). Accordingly, were this Court's first *Fioriglio* decision one resting on diversity jurisdiction, the Court would

---

**4.** The reporter for the Restatement explains the American Law Institute position:

> Many cases have said flatly that when the federal court sits in diversity jurisdiction, the law of the state where it sits determines the res judicata effects of the federal judgment. This seems plainly wrong when it comes to the elements of finality, and the better reasoned cases have so recognized.

Restatement (Second) of Judgments § 87 cmt. b (citing *Kern, Aerojet*, and *Glick* ).

be inclined to follow the vast weight of authority and apply federal preclusion law.

■ Because the first *Fioriglio* decision rested on federal question jurisdiction, albeit with pendant state-law claims, deciding which preclusion law to apply becomes considerably easier. Uniform authority dictates that federal law governs the issue and claim preclusion effects of a federal judgment in a federal question case. *See* 18 Wright et al., *supra*, § 4466 ("[T]he Supreme Court has repeatedly said that federal law controls, lower courts agree, and the commentators concur."). The state-law claims in Fioriglio's racial discrimination suit were not unrelated causes of action but rather mirror images of Fioriglio's federal law claims, springing from a common nucleus of operative facts and seeking the same relief. *See Hurley v. Atlantic City Police Dep't*, 933 F.Supp. 396, 413–14 & n. 14 (D.N.J.1996) (likening the N.J.L.A.D. to § 1983 and Title VII). These claims did not change the character of the otherwise purely federal action. In such circumstances, federal law and not the law of the state in which the federal court happens to sit should measure the preclusive effect of prior federal judgments. Accordingly, Fioriglio's racial discrimination suit does not preclude his instant retaliation suit under the entire controversy doctrine.

B. *Entire Controversy Doctrine—Administrative Proceedings*

■ Defendants next argue that Fioriglio's administrative proceedings before the PERC and the NJDOP bar his instant retaliation suit under the entire controversy doctrine. However, as noted above, the doctrine does not apply where "joinder would result in significant unfairness to the litigants or jeopardy to a clear presentation of the issues and a just result," *Mystic Isle*, 142 N.J. at 323, 662 A.2d at 529, or where "the first proceeding occurred before a lesser tribunal." *Petrocelli*, 993 F.2d 27, 29; *see also Cafferata v. Peyser*, 251 N.J.Super. 256, 261, 597 A.2d 1101, 1104 (App.Div.1991). Accordingly, in determining whether the entire controversy doctrine applies to these administrative proceedings, the Court must determine whether Fioriglio could have raised his federal claims before the administrative tribunals, and whether raising such claims would have constituted a full and fair opportunity to litigate them. *See Watkins v. Resorts Int'l Hotel & Casino*, 124 N.J. 398, 413–14, 591 A.2d 592, 599 (1991); *Cafferata*, 251 N.J.Super. at 261, 597 A.2d at 1104; *see also Jones v. Holvey*, 29 F.3d 828, 831 (3d Cir.1994), *cert. denied on appeal after remand*, —— U.S. ——, 116 S.Ct. 1329, 134 L.Ed.2d 480 (1996).

■ The PERC dismissed Fioriglio's *pro se* unfair practice charge because it did not have the statutory authority to address his grievances. *See* Plaintiff's Ex. G. The PERC can only remedy discrimination regarding the exercise of rights guaranteed by the New Jersey Employer–Employee Relations Act, N.J.S.A. §§ 34:13A–1 to 13A–21. Reverse discrimination and retaliation based on free speech are not among these rights. *See* N.J.S.A. § 34:13A–5.4; *see also Kelly v. Borough of Sayreville*, 107 F.3d 1073, 1079 (3d Cir.1997) (McKee, J., concurring) (noting PERC's "well-established practice of refusing to hear constitutional claims except insofar as they relate to statutory claims properly before it under the Act"). Thus, not only was Fioriglio unable to raise his instant claims before the PERC, but also the PERC could not have provided him with a full and fair opportunity to litigate them.[5] Accordingly, the entire controversy doctrine does not attach to Fioriglio's PERC proceeding.

■ The NJDOP similarly lacked the authority to pass on Fioriglio's instant feder-

---

5. Notwithstanding the limited scope of PERC hearings, the district court in *Kelly v. Borough of Sayreville*, 927 F.Supp. 797 (D.N.J.1996), found that plaintiff Kelly "could have" and should have "raised his federal claims before [the] PERC" and barred him under the entire controversy doctrine from thereafter litigating his claims in federal court. *Id.* at 803. The *Kelly* court considered Kelly's PERC hearing a "full and fair opportunity to litigate" his constitutional claims, a decision with which this Court respectfully disagrees. *Id.* The Third Circuit affirmed *Kelly* without reaching the entire controversy doctrine issue, but it expressed "significant reservations concerning the district court's disposition of that issue." *Kelly v. Borough of Sayreville*, 107 F.3d 1073, 1075 (3d Cir.1997). Addressing the issue in a concurrence, Circuit Judge McKee found the district court's analysis to be in error. See *id.* at 1078–80 (McKee, J., concurring).

al claims. The NJDOP and its Merit System Board may only interpret the application of New Jersey law to public bodies and entities. *See* N.J.S.A. § 11A:2–6(e); *In re Allen,* 262 N.J.Super. 438, 444, 621 A.2d 87, 90 (App. Div.1993). Fioriglio's federal constitutional claim falls clearly outside of the NJDOP's interpretive realm. Thus, Fioriglio could not have raised his federal claims before the NJDOP nor could it have addressed them. Accordingly, the entire controversy doctrine does not attach to Fioriglio's NJDOP proceeding either.

### C. *Abstention*

Defendants next argue that this Court should abstain from hearing Fioriglio's retaliation suit under the doctrines announced in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Specifically, defendants contend that this Court should not interfere with Fioriglio's pending appeal from the NJDOP to the Merit System Board.

▮▮▮ *Burford* abstention applies where there is an unclear issue of state law, complex state administrative procedures designed to address the issue, and a particular need for centralized decisionmaking. Where, as here, there is a substantial federal question at issue, a federal court should only invoke *Burford* abstention if (1) the subject of regulation is of special concern to the state, (2) the state regulatory scheme is detailed and complex, and (3) the federal issue cannot be resolved without requiring the federal court to immerse itself in the technicalities of the state scheme. *See New Orleans Public Svc., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 362–64, 109 S.Ct. 2506, 2515–16, 105 L.Ed.2d 298 (1989); *Chemerinsky, supra,* § 12.2.3.

Here, there are no complex issues of state law, the resolution of which would disrupt state efforts to establish a coherent policy on a matter of substantial public concern. Indeed, the federal issue-retaliation in violation of the First Amendment—can be resolved without addressing the technicalities of New Jersey administrative law. Accordingly, the

Court will not invoke *Burford* abstention and refrain from hearing Fioriglio's retaliation suit. *Cf. McNeese v. Board of Ed.,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963) (permitting black students to challenge school segregation without first invoking state administrative procedures).

▮▮▮ *Colorado River* abstention applies in "exceptional circumstances" where federal litigation essentially duplicates litigation simultaneously pending in state court. Considerations include the relative progress of the federal and state court litigations, the importance of avoiding piecemeal litigation, whether there is a congressionally declared policy that would be served by abstention, the relative inconvenience of the federal court to the parties, and whether there is a federal question being litigated. *See Colorado River,* 424 U.S. at 818–19, 96 S.Ct. at 1246–47; *Moses H. Cone Mem. Hosp. v. Mercury Constr. Co.,* 460 U.S. 1, 15–16, 25–26, 103 S.Ct. 927, 936–37, 941–42, 74 L.Ed.2d 765 (1983); *Chemerinsky, supra,* at § 14.2. The existence of a federal question, the Supreme Court held in *Moses Cone,* weighs heavily against abstention. *See Moses Cone,* 460 U.S. at 25–26, 103 S.Ct. at 941–42.

Nothing about Fioriglio's parallel proceedings are particularly exceptional. The extent of the progress of his NJDOP proceeding is a one-sentence determination that defendants' promotion determinations were correct. *See* Plaintiff's Ex. F. No action has yet been taken on Fioriglio's appeal from that determination. More importantly, Fioriglio's retaliation suit before this Court involves a federal question of constitutional dimension. Accordingly, the Court will not invoke the rarely applicable Colorado River abstention doctrine and refrain from hearing Fioriglio's retaliation case.

### D. *Defamation*

▮▮▮ Count Two of Fioriglio's complaint sets forth a defamation cause of action, for which the New Jersey statute of limitation is one year. *See* N.J.S.A. § 2A:14–3. His complaint alleges Whelan defamed him on May 14, 1994 and "at other various times," whereas he instituted the retaliation suit almost

two years later on May 9, 1996. *See* Amended Complaint at 12. As such, defendant Whelan seeks to dismiss Fioriglio's defamation count as brought outside the statute of limitations.

Fioriglio concedes, as he must, that this action began after the applicable statute of limitations had run. He argues, however, that he instituted administrative proceedings against Whelan within the statute and thus giving Whelan notice of the defamation claim. While Whelan might have had timely notice of Fioriglio's defamation claim, these administrative tribunals were not authorized to decide defamation claims and proceedings before these tribunals did not toll the one-year defamation statute. Accordingly, his instant defamation claim is brought out of time and the Court will grant Whelan's motion to dismiss it.

## E. *N.J.L.A.D.*

Count Five of Fioriglio's complaint alleges a violation of the N.J.L.A.D. in that defendants' discriminated against him on the basis of his "creed." *See* N.J.S.A. § 10:5–12(a) (prohibiting discrimination on the basis of "race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, sex, or atypical or hereditary cellular blood trait"). By "creed," Fioriglio means not his religion but rather the political beliefs he espoused during his campaign against Whelan for mayor. These include his beliefs that Whelan wasted City taxpayers' money and used his position as mayor to benefit his friends and political "cronies." *See generally* Plaintiff's Ex. E at E–9 (setting forth his campaign platform).

While no New Jersey court has yet interpreted the N.J.L.A.D. so creatively, the federal courts have expressly rejected Fioriglio's argument with respect to Title VII's similar language:

> A religious belief excludes mere personal preference grounded upon a non-theological basis, such as personal choice deduced from economic or social ideology. Rather, it must consider man's nature or the scheme of his existence as it relates in a theological framework. Furthermore, the belief must have an institutional quality about it and must be sincerely held by plaintiff.

*Edwards v. School Bd.*, 483 F.Supp. 620, 624 (W.D.Va.1980), *vacated and remanded on other grounds,* 658 F.2d 951 (4th Cir.1981). Because the New Jersey courts have often looked to Title VII jurisprudence to resolve questions under the N.J.L.A.D., *see Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 624–25, 626 A.2d 445, 464–65 (1993), and because this Court highly doubts that the Supreme Court of New Jersey would accept Fioriglio's "creed" argument, the Court will dismiss his N.J.L.A.D. claim for failure to state a claim upon which relief can be granted.

## F. *Remaining Arguments*

Defendants' remaining arguments address the factual contentions contained in Fioriglio's complaint. As such, the arguments are best left to motions for summary judgment or trial. Accordingly, the Court will deny defendants' factual challenges to Fioriglio's remaining claims.

## III. CONCLUSION

Because New Jersey's entire controversy doctrine does not bar Fioriglio's instant action, the Court will deny defendants' motions to dismiss in part. Because Fioriglio's defamation count was brought outside the statute of limitations and because his N.J.L.A.D. count fails to state a claim upon which relief can be granted, the Court will grant defendants' motions in part. An appropriate order will issue on even date herewith.