992 A.2d 50 (2010)
413 N.J. Super. 1
Laura HIGGINS and Robyn Calcaterra,[1] Plaintiffs-Appellants,
v.
Mary F. THURBER and Thurber Cappell, LLC, Defendants-Respondents.
DOCKET NO. A-0108-08T1
Superior Court of New Jersey, Appellate Division.
Telephonically Argued February 22, 2010.
Decided April 21, 2010.
*52 Gerald J. Monahan argued the cause for appellants.
Robert B. Hille argued the cause for respondents (Kalison, McBride, Jackson & Hetzel, Warren, attorneys for respondents; Mr. Hille, of counsel and on the brief; John W. Kaveney, on the brief).
Before Judges AXELRAD, FISHER and SAPP-PETERSON.
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we consider, among other things, whether this legal malpractice action commenced by plaintiffs Laura Higgins and Robyn Calcaterra against defendants Mary F. Thurber and Thurber Cappell, LLC,[2] the attorneys for the estate of their late father, was properly found precluded by the disposition of earlier lawsuits or otherwise barred, at least in part, by the statute of limitations. Although the claims against defendant-attorneys may have been asserted by Laura and Robyn in an earlier probate proceeding, we reverse because we cannot conclude that they were then given a full and fair opportunity to litigate those claims or that it would otherwise be equitable to bar this subsequent suit.

I
In reviewing the entry of summary judgment, we apply the same standard that governs the trial court. Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46, 916 A.2d 440 (2007); Spring Creek Holding Co. v. Shinnihon U.S.A. Co., Ltd., 399 N.J.Super. 158, 180-81, 943 A.2d 881 (App.Div.), certif. denied, 196 N.J. 85, 951 A.2d 1038 (2008). In applying the Brill[3] standard, we examine the record to determine whether there are disputes of material facts relevant to the legal issues posed. Having closely canvassed the record, we agree with the trial judge that the facts relevant to the application *53 of the entire controversy doctrine are not in dispute; indeed, that determination constituted a matter of law and equity that pivoted on an understanding of the protracted procedural history of the litigation surrounding the estate, as to which there is no legitimate question. We, thus, turn to the history of the lawsuits involving this estate.
The record reveals that Salvatore John Calcaterra (decedent or Sal) died on April 11, 1996. At that time he was married to his second wife, Donna Calcaterra. He was also survived by five children. Decedent's first wife was the mother of decedent's first four children  Laura, Michael, Sally and Robyn. Donna was the mother of decedent's fifth child, Jenna, who was born in 1984 and a minor at the time of Sal's death.
Prior to his death, Sal and Donna became estranged. Sal commenced a divorce action and executed a Will that disinherited Donna. However, during his final illness, Sal dismissed the divorce action, but he did not change his Will. Prior to Sal's death, Donna, who held a power of attorney from Sal, transferred to herself four of six seats Sal held on the New York Mercantile Exchange (NYMEX).
Sal's Will named his son Michael as executor of his estate. In 1996, Michael, as executor, commenced an action against Donna in the Chancery Division, Bergen County. Michael retained defendant-attorneys,[4] who filed a complaint alleging that Donna had improperly transferred the NYMEX seats and other assets (the NYMEX suit). The complaint sought, among other things, injunctive relief, a constructive trust, and return of the NYMEX seats and other property to the estate.
Slightly more than two years after the commencement of the NYMEX suit, the estate experienced problems staying current with accruing legal fees. According to an agreement executed on December 13, 1998, the estate and its beneficiaries  including Laura and Robyn  agreed defendant-attorneys would ultimately be entitled to a portion of the estate's gross recovery in the NYMEX suit. This written modification agreement also indicated that the beneficiaries would receive periodic invoices for the services rendered by defendant-attorneys.
Following a bench trial, the trial judge ruled in the NYMEX suit, on March 31, 1999, that the estate was entitled to four and Donna entitled to two of the NYMEX seats. Donna appealed and the estate cross-appealed. We affirmed by way of an unpublished opinion. In re Estate of Salvatore John Calcaterra, No. A-5739-98 (App.Div. Oct. 11, 2000).
On October 29, 1999, prior to our disposition of the appeal in the NYMEX suit, Donna commenced an action in the Chancery Division, Bergen County, against Michael and Robyn (the 1999 removal suit). Donna alleged that Michael had engaged in misconduct in his role as executor and that Robyn, who had been appointed Jenna's guardian ad litem pursuant to decedent's Will, had not acted in Jenna's best interests; she sought the removal of Michael and Robyn from those offices. Donna's verified complaint was dismissed with prejudice on January 14, 2000. The record on appeal does not disclose the reasons for dismissal.
On June 12, 2001, Donna commenced another action in the Chancery Division, *54 Bergen County (the 2001 removal action). In this action, she again sought the removal of Michael and Robyn from their positions as well as Michael's submission of a formal accounting. In response, Robyn filed a certification, dated November 26, 2001, claiming she and her sisters: had "the opportunity on several occasions to meet with counsel" and Michael; "reviewed the estate information with both legal and accounting professional advisors"; "asked questions [and] received answers"; "underst[oo]d all of the estate expenses and the issues related to estate income"; and had "confidence that [Michael] has administered the estate properly and fairly for the benefit of all the beneficiaries."[5] In addition, Robyn certified that Donna's contentions
suggest that the [informal] accounting raises many questions ... and implies we did not ask them. She is wrong. Th[e] [informal accounting] is a summary of information we received, reviewed, and understood. We believe that no good can come to the Estate by providing more detail to Donna [], who is the cause of most of the significant legal expenses incurred by the estate, and also the cause of substantial delay in the finalization of tax returns. We want the draining of the estate for legal expense to end, and that can only happen if Donna is stopped.
In 2003, the trial judge rejected Donna's efforts to remove Michael and Robyn[6] or to compel a distribution. When efforts to resolve the accounting disputes proved unsuccessful, the judge directed Michael to file a formal accounting.
On October 10, 2003, Michael filed a complaint in the Chancery Division, Bergen County, for approval of his formal accounting. In re Estate of Salvatore John Calcaterra, Docket No. BER-P-37-04, 2005 WL 1384311 (the formal accounting action). Exceptions were filed by Sally's estate[7] and by Jenna.
On March 18, 2005, while the formal accounting action remained pending and unresolved, Jenna filed suit in the Law Division, Somerset County, against Michael, Robyn and defendant-attorneys. Jenna Calcaterra and Sal Calcaterra & Company, LLC v. Mary F. Thurber, Thurber & Cappell, LLC, Michael Gerard Calcaterra and Robin Lynn Welling, Docket No. SOM-L-427-05 (the Somerset legal malpractice action). She alleged, among other things, that Michael and Robyn breached their fiduciary duties and that defendant-attorneys committed legal malpractice in representing the estate.[8] In April 2005, Robyn filed a cross-claim against defendant-attorneys; in "denying any wrongdoing of any defendants which was the proximate cause of damage to [Jenna]," Robyn sought contribution and indemnification from the other defendants to that suit.
In November 2005, while the Somerset legal malpractice action remained pending, Robyn and Laura filed exceptions in the formal accounting action still pending in Bergen County. The exceptions were *55 highly critical of the services rendered by defendant-attorneys and questioned the propriety of the 1998 fee agreement. All components of the Somerset legal malpractice action were dismissed by way of summary judgment on February 23, 2006.
By way of a March 20, 2006 consent order, defendant-attorneys were permitted to intervene in the formal accounting action pending in Bergen County "with respect to issues related to or arising out of [their] legal representation of the [e]state... and the legal fees and costs incurred in connection therewith." The March 20, 2006 order expressly stated that its entry would have no effect on the trial date, which was scheduled for May 30, 2006, slightly more than two months later.
On May 26, 2006  four days before the trial date  the judge in the formal accounting action considered a motion filed by Laura and Robyn to limit the defense of defendant-attorneys to certain issues.[9] At that time, the parties agreed, as stated in the judge's order,[10] that Laura and Robyn's claims against defendant-attorneys were "voluntarily dismissed, with the sole exception of the claims related to legal fees and costs charged to the [e]state and [the trust] as reflected in the [a]ccountings submitted for approval," and that defendant-attorneys' participation "shall accordingly be limited to defense of those claims." The order also stated that Laura and Robyn's "motion for entry of an order limiting [defendant-attorneys'] right to assert preclusionary defenses in any future proceeding is denied," and that defendant-attorneys' "application for an [o]rder pursuant to Rule 4:30A excepting from the [e]ntire [c]ontroversy [d]octrine's application her right to pursue claims for fees and costs incurred in intervention is granted and said claims are expressly reserved."
On May 31, 2006, the judge entered a consent order that resolved other claims. That order:
 "voluntarily dismiss[ed], without prejudice" Laura and Robyn's action against defendant-attorneys "for repayment of fees paid to her by the Estate and Trust";
 memorialized defendant-attorneys' "waive[r] [of] the defense of the bar of the [e]ntire [c]ontroversy [d]octrine and the defense" of Laura and Robyn's "lack of standing to sue [defendant-attorneys] in a separate action seeking disgorgement of a portion of the attorney fees charged to the [e]state ... pursuant to the [December 13, 1998 fee agreement]," but did not constitute a waiver of "any other claim";
 declared that "[w]ith respect to any claim in a separate action" by Laura and Robyn against defendant-attorneys "for disgorgement of their proportionate share of the interest component of the hourly portion of the contingent fee, [defendant-attorneys] will not raise or have the benefit of any statute of limitations defense not now available to Michael Calcaterra as Executor in the [formal accounting action]."
On June 22, 2006, the judge entered final judgment with regard to the remaining aspects of the formal accounting.
*56 On May 10, 2007, Laura and Robyn filed this action in the Law Division, Morris County, against defendant-attorneys, alleging legal malpractice, breach of contract, breach of the implied covenant of good faith and fair dealing, and the excessiveness and unreasonableness of the fees obtained by defendant-attorneys from the estate. Defendant-attorneys moved to dismiss the complaint. Properly viewing the motion as seeking summary judgment in light of the motion's referral to matters outside the pleadings, Lederman v. Prudential Life Ins. Co. of Am., Inc., 385 N.J.Super. 324, 337, 897 A.2d 373 (App. Div.), certif. denied, 188 N.J. 353, 907 A.2d 1013 (2006), the judge held that the legal malpractice claim was barred by the entire controversy doctrine and the fee-disgorgement claim was barred by the statute of limitations.[11]
We first examine the judge's application of the entire controversy doctrine and, thereafter, the judge's application of the statute of limitations.

II
In considering the application of the entire controversy doctrine to Laura and Robyn's legal malpractice claim, we start with the understanding that "the doctrine is one of judicial fairness and will be invoked in that spirit." Crispin v. Volkswagenwerk, A.G., 96 N.J. 336, 343, 476 A.2d 250 (1984). The doctrine was judicially created as a "reflection of ... the unification of the state courts" in light of our Constitution's recognition of "the value in resolving related claims in one adjudication so that `all matters in controversy between parties may be completely determined.'" Mystic Isle Dev. Corp. v. Perskie & Nehmad, 142 N.J. 310, 322, 662 A.2d 523 (1995) (quoting N.J. Const. art. VI, § 3, ¶ 4). As the Court recognized in Mystic Isle, the objectives of the doctrine are:
(1) to encourage the comprehensive and conclusive determination of a legal controversy; (2) to achieve party fairness, including both parties before the court as well as prospective parties; and (3) to promote judicial economy and efficiency by avoiding fragmented, multiple and duplicative litigation.
[Id. at 322, 662 A.2d 523.]
In considering the doctrine's application, courts are to be guided by the general principle that all claims arising from a particular transaction or occurrence should be joined in a single action. Brennan v. Orban, 145 N.J. 282, 290, 678 A.2d 667 (1996). That mandate encompasses not only matters actually litigated but also other aspects of a controversy that might have been litigated and thereby decided in an earlier action. Vision Mortg. Corp. v. Patricia J. Chiapperini, Inc., 307 N.J.Super. 48, 52, 704 A.2d 97 (App.Div.1998), aff'd, 156 N.J. 580, 722 A.2d 527 (1999). The doctrine does not, however, "apply to bar component claims that are unknown, unarisen, or unaccrued at the time of the original action." Mystic Isle, supra, 142 N.J. at 323, 662 A.2d 523. And it is also understood that the doctrine should not be applied when "joinder would result in significant unfairness [to the litigants] or jeopardy to a clear presentation of the issues and just result." Cogdell v. Hosp. Ctr. at Orange, 116 N.J. 7, 27, 560 A.2d 1169 (1989) (quoting Crispin, supra, 96 N.J. at 354-55, 476 A.2d 250). Ultimately, it is for the "trial court to determine whether or not joinder is appropriate in a *57 given case, and thus litigants should be compelled to bring all actions at one time," with the understanding that trial judges are empowered, once all claims are joined, "to segregate different claims to assure manageability, clarity and fairness." Mystic Isle, supra, 142 N.J. at 324, 662 A.2d 523.
The relationship between the entire controversy doctrine and probate actions has not been widely considered by our courts. Indeed, the notion, urged by defendant-attorneys here, that there is something amiss in the fact that serial lawsuits were filed by or against this estate or its representatives, misapprehends the nature of probate proceedings.
It is not uncommon for an estate to be the subject of numerous independent lawsuits. For example, a conflict between beneficiaries may arise as to whether a Will offered for probate was the product of undue influence. In such an instance, a complaint containing such allegations may ultimately result in a full blown action in the Probate Part before a final judgment is rendered as to whether the Will should be probated, or whether an earlier Will should be probated, or whether the decedent be deemed intestate. Following that, a second action might be filed regarding the conduct of an estate's representative, which may ultimately be tried and disposed of by entry of a final judgment. In addition, at various subsequent times, the estate's representative or other fiduciary may seek by way of a new lawsuit a declaration of the manner in which a Will or other instrument should be construed, R. 4:83-4(c)(2), or file a complaint for "directions by the court as to the fiduciary's authority or duties," R. 4:83-4(c)(3). And, ultimately, an estate may become the subject of another suit in which its representative seeks the court's approval of an accounting. R. 4:83-4(c)(1); R. 4:87-1.
So viewed, the argument that subsequent actions brought in the Probate Part may be barred by, for example, the complete adjudication of a dispute about the probating of a particular Will, is foreign to probate practice and inconsistent with the goals of the entire controversy doctrine. Indeed, phrased in the language of entire controversy principles, a suit by an executor seeking directions regarding the interpretation of a Will is a claim that would have been unknown or unaccrued on an earlier occasion when contestants litigated which of two wills should be admitted to probate. We thus reject as an inaccurate oversimplification defendant-attorneys' contention that "[t]he numerous lawsuits brought throughout the [S]tate of New Jersey over the last thirteen years are the exact type of piecemeal and repetitive litigation that the entire controversy doctrine was created to eliminate."
For the reasons we have expressed, the principles underlying the entire controversy doctrine were not offended when Laura and Robyn failed to pursue to a conclusion their legal malpractice claim in the NYMEX suit, the 1999 removal litigation, or the 2001 removal litigation. Their malpractice claim, during any of those proceedings, was arguably either unknown or unaccrued. Moreover, even if known and accrued, at some point during the life of those suits, its assertion on those earlier occasions would have been inconsistent with the nature of those particular proceedings. See Perry v. Tuzzio, 288 N.J.Super. 223, 672 A.2d 213 (App.Div. 1996).
The only colorable argument presented in support of the entire controversy doctrine's application as a bar to the legal malpractice claim asserted in the lawsuit at hand is whether it should have been adjudicated in the formal accounting action filed in 2003. As already observed, the *58 exceptions filed by Laura and Robyn in the formal accounting action were chiefly directed at the services rendered by defendant-attorneys and the propriety of the 1998 contingency fee agreement. Indeed, the fact that Robyn's counsel advised the judge in the Somerset legal malpractice action, in a letter dated November 30, 2005, that Robyn had filed exceptions in the 2003 formal accounting action that "raise a potential legal malpractice claim against" defendant-attorneys strongly suggested that those exceptions were viewed by her as having laid the groundwork for a legal malpractice action.[12] Counsel for defendant-attorneys confirmed a short time later his clients' "agreement ... to waive any [e]ntire [c]ontroversy [d]octrine defense against you for not filing a legal malpractice claim against her in the [Somerset legal malpractice action]."[13]
In addition, the exceptions filed in the 2005 formal accounting action challenged the propriety of the fees generated and the conduct of defendant-attorneys in their representation of the estate. Although those exceptions could be read as an indictment of the executor's handling of the estate, which, of course, is the proper scope of an action seeking approval of the accounting, the exceptions were so broad and expansive as to cause defendant-attorneys to seek to intervene in order to defend themselves. It is here that our decision in Perry v. Tuzzio becomes relevant to the discussion.
In Perry, we considered whether the entire controversy doctrine barred a claim filed in the Law Division by Perry, the succeeding executrix, against an accounting firm that had employed the estate's prior executor. 288 N.J.Super. at 226, 672 A.2d 213. During the course of the estate's administration, Perry discovered the questionable conduct of Tuzzio, the former executor, which had occurred during the decedent's lifetime,[14] and filed an action in the Probate Part seeking his removal; Tuzzio ultimately consented to an order substituting Perry as the estate's executrix and requiring that he turn over to her the estate's assets and settle his account. Id. at 226-27, 672 A.2d 213. Tuzzio then filed an action to settle his account. Id. at 227, 672 A.2d 213.
The final accounting listed as an asset at its face value the $80,000 "imprudent unsecured loan" of decedent's funds made by Tuzzio to clients of his accounting firm during the decedent's lifetime. Id. at 226-27, 672 A.2d 213. By the time of the accounting, the borrowers had defaulted and filed a petition in bankruptcy. Perry filed exceptions to this accounting, seeking *59 an order surcharging Tuzzio for the bad loan and for other relief. Id. at 227, 672 A.2d 213. Following an evidentiary hearing, which included an examination into Tuzzio's pre-executorship conduct in making the bad loan, the trial court surcharged Tuzzio and disallowed his claim to executor and accountant fees. Ibid. Tuzzio appealed and we affirmed, finding no prejudice to Tuzzio despite "the procedural anomaly in trying Tuzzio's pre-executorship conduct as part of the exception proceeding." Ibid.
During the pendency of Tuzzio's appeal, Perry filed her professional negligence action against Tuzzio's accounting firm based on respondent superior and negligent supervision theories. Id. at 228, 672 A.2d 213. The trial court applied the entire controversy doctrine in dismissing that action and Perry appealed. Ibid. We reversed. In speaking for the court, Judge Pressler recognized that if the former suit "had been an action at law against Tuzzio based on his negligence, fraud, or professional malpractice, plaintiff's failure to have joined Tuzzio's employers in that action would certainly have precluded this suit," id. at 229, 672 A.2d 213, but the
difficulty here lies in the fact that the original action was not a plenary action at law but rather a piece of a probate action  a hearing on exceptions to an executor's account. The question is whether an exceptant to an accounting is obliged in that summary proceeding to join all persons, uninvolved as they may be in the probate proceeding, who have any transactional relationship to the subject of the exception  irrespective of the nature of that relationship, irrespective of a right to jury trial and full discovery which any such person might have, and irrespective of the burden such a requirement may impose on the orderly procedure for the administration of decedent's estate.
[Ibid.]
Having recognized the differences between the application of the entire controversy doctrine when there have been serial actions at law to the circumstance where an action at law succeeded an accounting dispute in probate, we expressed in Perry our doubt that the entire controversy doctrine "was ever intended to go this far since its application in [the latter] situation is so basically inconsistent with the nature of an accounting proceeding." Ibid. In other words, the action on an accounting in probate is a vehicle for addressing "the conduct of the executor, not the conduct of others." Ibid.; see also Levchuk v. Jovich, 372 N.J.Super. 149, 156-57, 855 A.2d 635 (Law Div.2004).
At that time we also recognized the anomalous but appropriate expansion of the issues in the accounting proceeding as including Tuzzio's attempts to justify his pre-executorship conduct as necessary to his defense to the attack on this accounting. Perry, supra, 288 N.J.Super. at 230, 672 A.2d 213. Implicit in the court's decision is the fact that consideration of Perry's professional negligence action would necessarily duplicate much of the proofs in the accounting action.[15] However, we found that the application of the entire controversy doctrine as a bar to Perry's subsequent action against the accounting firm would be inequitable for two reasons. First, we considered whether "the first forum [was] able to provide all parties with *60 the same full and fair opportunity to litigate the issues and with the same remedial opportunities as the second forum," and held that "[t]he limited nature of the accounting procedure in general and the hearing on exceptions in particular readily indicates that that was neither the forum nor the procedure for litigating a professional malpractice claim against persons not in interest in the estate." Id. at 230, 672 A.2d 213. And, second, we determined that the summary nature of the accounting action would prevent a person interested in an estate from filing an affirmative pleading other than exceptions to the accounting and, thus, eliminate any opportunity to join new parties. Id. at 230-31, 672 A.2d 213.
Presaging what occurred in the case at hand, Judge Pressler also observed in Perry that "had plaintiff had sufficient foresight to seek the extraordinary relief of joining these defendants in the exception hearing, we have no doubt that the court's proper response would have been either a denial of the application, or a reservation of the claim for future litigation, or a grant of the application subject to severance for later separate trial." Id. at 231, 672 A.2d 213. But here, as the record on appeal demonstrates, the judge in the formal accounting action did not view the exceptions in the narrow manner suggested by Judge Pressler in these comments. Instead, by order entered on March 20, 2006, defendant-attorneys were permitted to intervene in the accounting action and allowed to litigate "issues related to or arising out of [defendant-attorneys'] legal representation of the [estate] and the legal fees and costs incurred in connection therewith." The trial court's subsequent order of April 7, 2006 called for the expedited submission of expert reports and expert depositions in light of the trial scheduled for May 30, 2006.[16] As we have already noted, as the trial date neared, Laura and Robyn moved for an order limiting the scope of the issues involving defendant-attorneys, which led to the entry of an order that memorialized the voluntary dismissal of Laura and Robyn's claims against defendant-attorneys "with the sole exception of the claims related to legal fees and costs charged to the [e]state and the [trust] as reflected in the [a]ccountings submitted for approval." The judge denied Laura and Robyn's request for an order limiting defendant-attorneys' assertion of "preclusionary defenses in any future proceeding." Unquestionably, to the extent the claims purportedly asserted against defendant-attorneys by Robyn and Laura in their exceptions to the accounting constituted a claim of legal malpractice, that aspect was dismissed pursuant to the June 16, 2006 order.
It is also important to recognize that to the extent a legal malpractice action against defendant-attorneys resided in the interstices of Laura and Robyn's exceptions in the formal accounting action, the June 16, 2006 order only called for its dismissal without prejudice. Although the record on appeal does not contain the judge's decision with regard to the motion that prompted that order, the order itself indicates that the dismissed claims were "voluntarily dismissed." We assume, therefore, that the order was based on Rule 4:37-1(b), which permits a dismissal of an action "at the plaintiff's instance only by leave of court and upon such terms and conditions as the court deems appropriate." One of those conditions, as the judge's order explicitly declared, was his rejection of Laura and Robyn's application to limit defendant-attorneys' "assertion of *61 preclusionary defenses in any future proceeding." More importantly, the voluntary dismissal of the malpractice claim  to the extent the exceptions in the accounting action may be interpreted as including such a claim  was, by operation of rule, without prejudice. See R. 4:37-1(b) (declaring that, "[u]nless otherwise specified in the order, a dismissal under this paragraph is without prejudice"). Indeed, the parties must have understood as much in light of the decretals that referred to the potential for subsequent proceedings between them. Accordingly, Laura and Robyn did not act inconsistently with the June 16, 2006 order when they asserted legal malpractice claims in this action, and defendant-attorneys did not act inconsistently with that order when they moved for its dismissal on entire controversy doctrine grounds.
For essentially the same reasons expressed by Judge Pressler in Perry, we reject the application of the entire controversy doctrine to bar the legal malpractice action asserted here. We cannot gather from the record on appeal that Laura and Robyn were truly given a full and fair opportunity to prosecute that claim within the context of the formal accounting action. The orders entered in that case reveal: intervention of defendant-attorneys was permitted on March 20, 2006; a subsequent order called for the service of expert reports by April 27, 2006; depositions of experts were ordered to occur within the week after service of the reports; and the trial date for the entire action remained set for May 30, 2006. Although the judge in that action had unmistakably expanded the scope of the proceedings beyond what might normally be expected in an accounting action in the Probate Part, the opportunity for a full and fair hearing on those new issues was illusory. That is, the judge gave Laura and Robyn a right to pursue whatever claims against defendant-attorneys that may have been encompassed by their exceptions, but did not provide the concomitant right to a full and fair exploration or development of those issues prior to a trial date that loomed a mere two months after expansion of the accounting action's scope.[17] Accordingly, giving full expression to the equitable nature of the entire controversy doctrine, we conclude it would be unfair and unjust to bar the legal malpractice claim in these circumstances. We, thus, reverse and remand that aspect of the order under review.

III
The judge also granted summary judgment dismissing the fee-disgorgement claim based on the six-year statute of limitations, N.J.S.A. 2A:14-1. The gravamen of the fee-disgorgement claim was that the 1998 fee modification agreement called for the payment to defendant-attorneys of a percentage of the recovery in the NYMEX suit. Later, as a consequence of that promise, defendant-attorneys demanded full payment of the fee rather than installments that might have alleviated the estate's need to sell any NYMEX seat to achieve sufficient liquidity. Because the record is unclear as to the commencement of the limitation period on this claim, we reverse that part of the order under review as well.
Due to the manner in which these issues were raised, the judge was not presented with a single affidavit or certification of a person with personal knowledge with the exception of those filed in earlier suits. As indicated, the motion filed by defendant-attorneys sought dismissal pursuant *62 to Rule 4:6-2(e), and was based on an attorney's certification, which largely recounts the procedural history of the various lawsuits involving this estate. Laura and Robyn apparently filed only a brief in opposition since the record on appeal does not suggest they filed any opposing certifications.[18] As a result, there was nothing of an evidential nature[19] presented to the trial judge in this action other than some of the materials attached to the attorney's certification, that would reveal a thorough and clear response to a question that was deemed by the parties and the trial judge as critical: when did Laura and Robyn know or have reason to know of the alleged excessiveness of the overall counsel fee charged to the estate?
Although Laura and Robyn were parties to the 1998 fee modification agreement  an event that demonstrably occurred more than six years before the commencement of this action  there is nothing about the agreement that would necessarily provide Laura and Robyn with an inkling of the ultimate counsel fee burden to the extent required by our summary judgment standards. It is also true, as argued, that the 1998 agreement indicated that defendant-attorneys would periodically forward copies of statements for services rendered to the beneficiaries. But, again, the record contains no certification or affidavit asserting that statements were forwarded to the beneficiaries or that the beneficiaries would understand that a failure to object would later preclude their assertion of the excessiveness or unreasonableness of the overall fee charged to the estate.[20]
In granting summary judgment on this aspect of the suit, the judge relied upon Laura and Robyn's execution of "acknowledgements *63 and acceptances," which indicated, as the judge held, that "they knew what was going on with the estate ... [a]nd they agreed to it, and they consulted with their professionals, they asked questions, they had answers, and they were satisfied." This is certainly an accurate appraisal of what was then stated by Laura and Robyn in those documents. However, to the extent these statements pinpoint the date upon which Laura and Robyn understood the overall quantum of fees charged by defendant-attorneys, they do not support dismissal because the earliest of these documents was executed on August 1, 2001 and the complaint was filed on May 10, 2007, less than six years later.
The judge also relied upon a paragraph of the complaint filed by Laura and Robyn in concluding they knew the estate was obligated to sell NYMEX seats to pay the entirety of the outstanding fee at some point more than six years prior to the filing of this complaint; that paragraph of the complaint states:
Moreover, [defendant-attorneys'] insistence, over the strenuous objection of the [p]laintiffs, that her $847,000.00 fee be paid in a lump sum was improper because the aforesaid December 13, 1998 written retainer agreement was silent as to precisely when [defendant-attorneys'] fee had to be paid or whether or not [defendant-attorneys] could insist on a lump sum payment and refuse an installment payment plan regardless of adverse consequences to the [e]state. [Defendant-attorneys'] assertion of an alleged right to a lump sum payment was a contractual right she did not have and knew she did not have.
The judge coupled this allegation with a statement made by Laura in her deposition in the formal accounting action in which she recalled a conversation about "the possible sale of the seats" that may have occurred in the spring of 2000.[21] That Laura may have had a conversation, which occurred approximately seven years before the commencement of this action, about the "possible sale" of NYMEX seats to pay the attorney's fee is not necessarily consistent with the type of knowledge required to trigger the running of the statute of limitations period. See Grunwald v. Bronkesh, 131 N.J. 483, 621 A.2d 459 (1993).
The particular paragraph of the complaint cited by the judge in her decision and quoted above,[22] as well as Laura's *64 uncertain testimony concerning when discussions about possibilities regarding the sale of the NYMEX seats to satisfy defendant-attorneys' fee in a lump sum, are insufficient to support a summary judgment based on the statute of limitations.
In so holding, we do not foreclose the potential for the future presentation of a more viable motion based on the statute of limitations. We simply conclude that the summary judgment framework was too fragile for the conclusions reached by the judge on this record. See, e.g., Grow Co. v. Chokshi, 403 N.J.Super. 443, 470, 959 A.2d 252 (App.Div.2008). We, thus, reverse the order under review insofar as it dismissed any portion of this action on the basis of the statute of limitations with the understanding that defendant-attorneys are not precluded from again moving for summary judgment on statute of limitations grounds upon a more fully developed exposition of the issues.[23]
Reversed and remanded.
NOTES
[1] This plaintiff's name is spelled as both "Robyn" and "Robin" throughout the record. We will use the former spelling, as that is the way her name appears in the complaint she and Laura filed in this action.
[2] The complaint alleges that at some point after execution of the retainer agreement, which commenced defendant Thurber's involvement with this estate, her practice merged to form Thurber & Cappell, LLC. Laura and Robyn allege in the complaint that Thurber Cappell, LLC "succeeded to the liabilities of defendant Thurber." We assume for present purposes only that this allegation is true and hereafter, in the interest of simplicity, refer to both as "defendant-attorneys."
[3] Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
[4] The retainer agreement dated April 30, 1996 was executed by defendant Mary Thurber and Michael, as executor of the estate. In executing that agreement, Michael promised to promptly pay defendant-attorneys' interim bills, which would be based upon the time expended at defendant-attorneys' customary rates.
[5] The record reveals that Laura and Robyn also executed documents, dated August 1, 2001, "acknowledging and accepting" Michael's informal accounting.
[6] The claim that Robyn should be removed as Jenna's guardian ad litem became moot during those proceedings when Jenna reached the age of majority.
[7] Sally died in October 2001.
[8] The claims asserted against defendant-attorneys in this action and in subsequent actions also encompass their representation of a testamentary trust. For the most part, we simply refer throughout this opinion to both those juridical entities as "the estate."
[9] The parties have insinuated that the judge in that action was poised to rule adversely to Laura and Robyn. Neither side, however, has included any transcripts or written decisions that were rendered in the formal accounting action other than the judge's orders, which give no such indication. Accordingly, we have no way to assess defendant-attorneys' argument that the judge was prepared to deny Laura and Robyn's motion when they consented to a voluntary dismissal of a portion of their exceptions.
[10] An order memorializing the resolution of issues on May 26, 2006 was entered on June 16, 2006.
[11] The judge did not specifically refer to each count of the complaint, but we discern from her oral decision an intention to dismiss all the claims, except the legal malpractice claim, pursuant to the statute of limitations.
[12] Certainly, in the November 30, 2005 letter, counsel was concerned about the applicability of the entire controversy doctrine to that legal malpractice claim as revealed by counsel's following comments in that letter: "I simply do not know whether or not my failure to amend my [a]nswer in the action pending before you to include Robin's legal malpractice claim against [defendant-attorneys] will preclude this claim in a later, separate action. Prudence dictates that I now raise this issue of subsequent preclusion before it is too late."
[13] In light of that agreement, we view as without merit any attempt by defendant-attorneys to now argue that the legal malpractice claim asserted in the case at hand should be barred by the failure to assert that claim in the Somerset legal malpractice action. Even if Laura and Robyn violated entire controversy principles by not asserting a legal malpractice action in the 2001 removal action, it would be inequitable for defendant-attorneys to now renege on its earlier agreement not to assert that argument.
[14] That is, the plaintiff discovered during the course of the administration of the estate that the executor, who was given a limited power of attorney by the decedent during her lifetime, had made "an imprudent unsecured loan of $80,000 to clients of his firm to enable them to purchase a home." Id. at 226, 672 A.2d 213.
[15] Indeed, there were apparently so many similarities between the two actions that Perry moved in the trial court for the application of collateral estoppel based on the findings of the probate court. Id. at 228, 672 A.2d 213. We affirmed the trial court's rejection of that contention without much explanation. Ibid.
[16] Apparently, as of that date, defendant-attorneys had not even filed a responsive pleading, since the order directed that such a pleading be filed on or before April 5, 2006.
[17] The very order permitting intervention unmistakably declared that the trial date of May 30, 2006 would remain inviolate despite intervention.
[18] In fact, the judge mentioned in her oral decision disposing of this case that the complaint, which she recognized was not verified, was "the only thing that I have from the ... plaintiffs in this action."
[19] Attorney affidavits or certifications that are not based on personal knowledge constitute objectionable hearsay. Gonzalez v. Ideal Tile Importing Co., 371 N.J.Super. 349, 358, 853 A.2d 298 (App.Div.2004), aff'd, 184 N.J. 415, 877 A.2d 1247 (2005), cert. denied, 546 U.S. 1092, 126 S.Ct. 1042, 163 L.Ed.2d 857 (2006); Murray v. Allstate Ins. Co., 209 N.J.Super. 163, 169, 507 A.2d 247 (App.Div.1986), app. dis., 110 N.J. 293, 540 A.2d 1276 (1988); Pressler, Current N.J. Court Rules, comment on R. 1:6-6 (2010). Here, the attorney's certification was sufficient as a vehicle to provide the court with authentic copies of earlier pleadings and materials, but to the extent the attorney interpreted events not supported by the authenticated attachments, it was inadequate to buttress the entry of summary judgment.
[20] The 1998 agreement purports to impose certain burdens on the parties to the agreement:

Future statements from the Law Firm will be sent to all Beneficiaries and all Beneficiaries will review them promptly. Any questions by the Beneficiaries about any item or charge on the statements will be raised and addressed promptly. The statements and all items on them will be considered accepted and approved in their entirety fourteen days after mailing, unless a Beneficiary raises a question within that time.
Notwithstanding this apparent attempt to limit the clients' ability to object to a bill later than fourteen days after its receipt  the enforceability of which is dubious at best  defendant-attorneys' reliance upon this provision as evidence of Laura and Robyn's acceptance of the fairness of the fees ignores the fundamental fact that responsibility for those fees rested, in the first instance, on the executor, who had the fiduciary obligation to ensure the estate was only charged for a reasonable fee at pain of his being surcharged. Considering the process that produced the order under review, we find that the questionable legal theory upon which the contention is based precluded the entry of summary judgment. The mere submission of bills by defendant-attorneys to Laura and Robyn alone did not necessarily trigger the running of the statute of limitations of a claim for the return of those fees.
[21] We note that defendant Thurber's certification in support of her application to intervene in the formal accounting action does not assert that the sale of the NYMEX seats to pay her fee was discussed with either Robyn or Laura in 2000. Instead, Thurber only stated that "[p]ayment of counsel fees, sales of the NYMEX seats, and the [e]state expenditures and distributions were all disclosed to and discussed" with Laura and Robyn "in 2001, 2002 and 2003, through informal accountings, telephone conversations, meetings and correspondence" (emphasis added). Defendant-attorneys never provided anything more specific in support of this aspect of their motion to dismiss. Although this reference to 2001 suggests the possibility that conversations occurred more than six years prior to May 10, 2007, it is hardly conclusive as to whether Laura and Robyn had all the information necessary to commence the fee-disgorgement action on a date earlier than May 10, 2001. Indeed, the event that lies at the heart of the fee-disgorgement claim appears to be the sale of the NYMEX seats. There appears to be no dispute that the first seat was sold on May 22, 2001 and the second in December 2001, that is, less than six years prior to the commencement of this action.
[22] Although a pleading may, as a general matter, be viewed as an admission, see N.J.R.E. 803(b)(3), our pleading practices, which permit the assertion of alternative claims, render problematic the use of a particular statement in a complaint  particularly one that is equivocal or that consists of a mixture of both facts and legal conclusions. See Shankman v. State, 184 N.J. 187, 205-06, 876 A.2d 269 (2005); see also Glick v. White Motor Co., 458 F.2d 1287, 1291 (3d Cir.1972) (holding that "to be binding, judicial admissions must be unequivocal"); Van Sickell v. Margolis, 109 N.J.Super. 14, 18, 262 A.2d 209 (App.Div.1969) (holding that a "pleader's conclusions of law are not admissions of facts"), aff'd, 55 N.J. 355, 262 A.2d 203 (1970). Even assuming the usefulness of the paragraph of the complaint alluded to by the judge in light of these authorities, we find nothing in that paragraph that unequivocally demonstrates Laura and Robyn had the requisite knowledge of facts necessary to commence the running of the limitation periods applicable to their present claims.
[23] We are also mindful that defendant-attorneys waived, by way of an order entered in the final accounting action, the defense of the statute of limitations insofar as it might apply in a subsequent action filed by Laura and Robyn "for disgorgement of their proportionate share of the interest component of the hourly portion of the contingent fee."